UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


| | | |
|---|---|---|
| HAWKEYE-SECURITY INSURANCE COMPANY, and THE MIDWESTERN INDEMNITY COMPANY, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 4:08CV01071 ERW |
| | ) | |
| DONALD A. BUNCH, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter comes before the Court on a Non-Jury Trial held in this case on January 11-13, 2010.  The Parties filed Post-Trial Briefs [docs. #127, 128], and Responses to said Trial Briefs [docs. #131, 133].

This case arises out of a dispute between former employees of Total Lock & Security, Inc. ("Total Lock") and The Installers Company ("Installers") (when discussed interchangeably, "Total Lock/Installers") and Total Lock/Installers' insurers, regarding insurance coverage.  On November 26, 2007, Defendant Daniel Henry Brandt, II ("Mr. Brandt") was driving a Total Lock company vehicle that had been assigned to Defendant Donald A. Bunch ("Mr. Bunch") and Defendant Patricia A. Bunch ("Mrs. Bunch"), when he was involved in an accident.  Mr. Bunch was a passenger in the vehicle, and was seriously injured.

Mr. Bunch and Mrs. Bunch filed a Petition for Personal Injury/Automobile Accident in the Circuit Court of Jefferson County, Missouri, against two defendants, including Mr. Brandt. Plaintiffs Hawkeye-Security Insurance Company and the Midwestern Indemnity Company then

filed this declaratory judgment action, seeking a declaration that there is no coverage for Mr. Brandt and no underinsured coverage for Mr. Bunch arising out of the November 26, 2007 automobile accident.

## I.    FINDINGS OF FACT

### A.    TESTIMONY OF OFFICER CHARLES CARY HOUSTON

On November 26, 2007, at 7:36 p.m., Officer Houston[1] was dispatched to a two-car automobile collision at the intersection of Highway A and Bradley Street in Festus, Missouri.  The accident involved a Ford F-250 pickup and a 2004 white Jeep Liberty ("Jeep Liberty"), driven by Mr. Brandt.  (Trial Tr. 1-11-2010 P.34 L.12-P.35 L.22) (Plaintiffs' Exhibit No.5).  Mr. Bunch was a passenger in the Jeep Liberty.  (Trial Tr. 1-11-2010 P.35 L.23-P.36 L.3).  When Officer Houston approached the Jeep Liberty, he detected the odor of alcohol on Mr. Brandt's breath. Officer Houston asked Mr. Brandt "if he had anything to drink."  Mr. Brandt told Officer Houston that "he had one beer earlier tonight."  (Trial Tr. 1-11-2010 P.36 L.24-P.37 L.6).

After smelling alcohol on Mr. Brandt's breath at the scene of the accident, Officer Houston looked directly into Mr. Brandt's eyes, and "noticed that they were glassy and had a watery look to them and they were bloodshot."  (Trial Tr. 1-11-2010 P.37 L.14-16).  Officer Houston asked Mr. Brandt to take three field sobriety tests, the first of which was the "horizontal gaze nystagmus test," in which the officer watches eye movement to determine if there is an involuntary twitching of the eyes.  Officer Houston concluded that "he showed six clues, three in each . . . eye.  He had no smooth pursuit.  He had distinct and sustained nystagmus.  He had

---

[1]Officer Houston, a ten-year veteran of the Festus, Missouri Police Department, has a Master's Degree in Criminal Justice Administration.  (Trial Tr. 1-11-2010 P.30 L.17-P.31 L.1).

maximum deviation. And he . . . showed onset of nystagmus prior to 40 degrees in each eye." Officer Houston testified that these results "[i]ndicate[] that he's intoxicated." (Trial Tr. 1-11-2010 P.39 L.1-P.40 L.3). Officer Houston next administered the "one leg stand test." According to Officer Houston, in that test, Mr. Brandt demonstrated the following clues: "swayed wide balancing, used his arm for balance, and he put his foot down four times during the test." In the third test, which the officer again described as the "one leg stand" (obviously meaning "heel to toe test"), Officer Houston observed "three out of eight clues that we're looking for," specifically Mr. Brandt "failed to maintain heel to toe stance, los[t] his balance while turning improper turn, and he took an incorrect number of steps on his first line of steps." (Trial Tr. 1-11-2010 P.40 L.4-15). Additionally, Officer Houston said that Mr. Brandt used profanity throughout the time they were talking, and that he detected a "strong odor of alcohol" on Mr. Brandt's breath. (Trial Tr. 1-11-2010 P.40 L.16-P.41 L.12).

Officer Houston then arrested Mr. Brandt and put him in the patrol car. (Trial Tr. 1-11-2010 P.41 L.13-22). After Mr. Bunch, who was "obviously injured," was removed from the accident scene and taken to the hospital by ambulance, Officer Houston transported Mr. Brandt to a police station. At 8:12 p.m., Officer Houston administered a breathalyzer test on Mr. Brandt, which recorded a reading of 0.196, more than twice the legal limit for intoxication. Officer Houston testified that Mr. Brandt was "obviously intoxicated." (Trial Tr. 1-11-2010 P.41 L.23-P.43 L.3). After Officer Houston gave Mr. Brandt a *Miranda* warning, he confessed to having four beers as opposed to the one beer he admitted to earlier. He said he drank three beers at home, and one beer at Mr. Bunch's mother's house. (Trial Tr. 1-11-2010 P.54 L.14-25).

## B.     TESTIMONY OF CHRISTOPHER LONG

Mr. Brandt claims that he did not consume sufficient alcohol prior to the accident to be intoxicated, and that he was not intoxicated at the time of the accident. To refute Mr. Brandt's claim, Plaintiff called Christopher Long, a forensic toxicologist, with a Bachelor's Degree in Chemistry, a Master's Degree in Medical Biology, a second Master's Degree in Pharmacology Toxicology, and a Doctorate Degree in Toxicology.[2] (Trial Tr. 1-11-2010 P.56 L.12-P.57 L.5). Dr. Long looked at the results of Mr. Brandt's breathalyzer test and reached various conclusions regarding the amount of alcohol that Mr. Brandt consumed on the day of the accident, and when that alcohol was consumed. (Trial Tr. 1-11-2010 P.62 L.16-21). He first discussed the behaviors associated with a blood alcohol concentration ("BAC") of 0.09 to 0.25, explaining that "you're showing loss of fine motor control, loss of gross motor control, you drop your drinks, slurring of speech, slurred speech, slow reaction time, this impairment of the eyes, color, distance and so forth. In fact, in this range is where you start to get double vision, and that is where each eye starts to function independently." (Trial Tr. 1-11-2010 P.67 L.20-P.68 L.5) (Plaintiffs' Exhibit No.4A). Dr. Long then discussed the behaviors associated with a BAC of 0.18 to 0.30, explaining that "people become very sedated at that point. They don't want to do much. There's gross inattention. There's impairment of fine and gross motor control. But basically they just want to lay down and sleep it off." (Trial Tr. 1-11-2010 P.68 L.12-19) (Plaintiffs' Exhibit No.4A).

Dr. Long testified that considering the accident occurred at 7:34 p.m., and the breathalyzer test was administered at 8:12 p.m., Mr. Brandt's BAC at the time of the accident

---

[2]Dr. Long is qualified to testify as an expert witness.

would have been approximately 0.207. Dr. Long further explained that this would mean that "over seven and one-half beers would have been in [Mr. Brandt] at the time of the accident. That does not include any time for metabolism." He testified that the metabolism rate is 0.018 gram percent per hour. Incorporating this metabolism rate, Dr. Long testified that, considering his BAC at the time of the accident, it is not physically and scientifically possible for Mr. Brandt to have consumed the amount of beer he claims to have consumed on November 26, 2007: six beers in the morning, one beer from 3:30 to 5:00 and two beers between 5:00 and 7:30. To the contrary, in order to reach the BAC of Mr. Brandt at the time of the accident, Dr. Long testified that Mr. Brandt would have had to consume between six and eight additional drinks. (Trial Tr. 1-11-2010 P.76 L.3-P.77 L.7-78 L.16) (Plaintiffs' Exhibit No.21) (Plaintiffs' Exhibit No.22). Dr. Long gave convincing testimony.

### C. TESTIMONY OF DANIEL HENRY BRANDT, II

Mr. Brandt lives at 333 Heritage Hills Drive, Arnold, Missouri, which is the home of Mr. and Mrs. Donald A. Bunch. He has lived with them for more than two years at this residence, and has "boarded with them at other residences of theirs." (Trial Tr. 1-11-2010 P.112 L.21-113 L.21). He testified that he and the Bunches are very close and that, if possible, he would help them in any manner that was legal. He stated that he wishes the best for the Bunches, and believes that "the best for Donald would be a miraculous recovery." He feels badly about the accident. After the accident, Mr. Brandt pled guilty to Driving While Intoxicated, and he testified that there was no question that at the time of the accident he was intoxicated. As a result of the accident, his license was suspended. Mr. Brandt was aware that Defendant Donald Bunch had received a DWI several years before the accident and, thus, could not drive for his employer. He

believes that Mr. Bunch received his DWI five to seven years ago. (Trial Tr. 1-11-2010 P.114 L.5-P.115 L.24).

Mr. Brandt began working as an installer with Total Lock/Installers, on June 14, 2007. As an installer, he went to various job sites, both new construction and preexisting buildings, installing door locks. (Trial Tr. 1-11-2010 P.116 L.1-P.118 L.3). Mr. Brandt testified that when he was hired by Gidget Fogerty,[3] she explained that he was being hired by Total Lock, which owns Installers. She told him that he worked for Total Lock, but that on certain jobs he would be told to say that he works for Installers and not to mention Total Lock, while on other jobs he would be told to say he works for Total Lock and not to mention Installers. (Trial Tr. 1-11-2010 P.159 L.3-17).

Mr. Brandt's job at Total Lock required him to leave St. Louis, and when he was out of town, a vehicle would be assigned to him, and he would be designated as the driver of that vehicle. (Trial Tr. 1-11-2010 P.116 L.1-P.118 L.3). While on the road, he was allowed to use the car for personal use, for example, to do laundry and to get groceries. (Trial Tr. 1-11-2010 P.118 L.4-15). Mr. Brandt stated that when he worked, he was assigned a vehicle or he sometimes rode with others. He was told that as long as he was working for Total Lock/Installers, he had access to the trucks, and once he was an authorized driver for one of the companies, he could operate any of their vehicles. Mr. Brandt testified that each employee was assigned an employee identification number to be used to "fill-up with gasoline." (Trial Tr. 1-11-2010 P.159 L.18-P.160 L.22). He explained that when he was out on the road with other

_____

[3]Gidget Fogerty is also known as Michelle Fogerty. She is the sole owner and president of Total Lock & Security, Inc. and The Installers Company.

6

employees, any of the employees who were also authorized drivers could operate the company vehicles. (Trial Tr. 1-11-2010 P.161 L.1-13).

Mr. Brandt testified that typically, when returning from a job, he would return the car back to the lot, and then drive home. Sometimes, he would have someone drop him off at the lot before picking up the car, and then pick him up at the lot after the car was returned. (Trial Tr. 1-11-2010 P.121 L.25-P.122 L.15). He also testified that he did not always take the vehicle assigned to him back to the company, but occasionally took the vehicle home. No one ever told him he could not do that, and it was his understanding that this was permitted. He testified that "there was contact on our way back into St. Louis with someone at the office, and they gave instructions as to when we would be going out again and who was to keep the vehicle, and when they were to have it back for restock." He said he took a vehicle home on two occasions and other times, he dropped it off. He said that other employees took vehicles home. (Trial Tr. 1-11-2010 P.161 L.14-P.162 L.14). He claimed that in August or September, Gidget Fogerty's nephew, also an installer, spoke with Gidget on the phone and then told Mr. Brandt that "one of the salespeople left a truck at the shop and I could use that, but it had to be back by Monday morning." He claimed that Gidget permitted him to take that truck home, to get to and from work. (Trial Tr. 1-11-2010 P.121 L.25-P.123 L.9).

Mr. Brandt testified that while he worked for Total Lock, no one gave him any written instructions on the use of company vehicles. (Trial Tr. 1-11-2010 P.166 L.10-13). At first, he stated that Eve Rone never gave him instructions on replenishing gas after using the vehicle. However, he was then shown his deposition testimony where he testified that she told him if he used the vehicle for personal use to be sure the gas was replenished, and he agreed that it was

possible that he made that statement. (Trial Tr. 1-11-2010 P.166 L.10-P.167 L.7). He said that Gidget Fogerty had told him that when he was out on the road he needed to take time away from work and get out to see the sights. He also testified that no supervisor at Total Lock/Installers told him that when he kept a company vehicle in St. Louis, he could not use that vehicle for personal errands. (Trial Tr. 1-11-2010 P.169 L.20-P.170 L.4).

Mr. Brandt testified that he understood that in 2007, he did not have permission to use or operate a company vehicle when he was drinking alcohol. He knew that the company had a zero tolerance rule for the use of company vehicles while drinking, and he knew that if he had been drinking he could not take a set of keys and get in one of their cars and drive. (Trial Tr. 1-11-2010 P.123 L.14-25). He assumed that if he drank alcohol, he would not have permission to drive one of the company vehicles. (Trial Tr. 1-11-2010 P.124 L.4-P. 125 L.12).

At trial, Mr. Brandt denied that he took a leave of absence from his job sometime in October 2007. He testified that he merely requested "to come home for a week." (Trial Tr. 1-11-2010 P.118 L.16-20). However, in his deposition testimony, Mr. Brandt testified that in October or November, he did request a leave of absence to spend time at home with his family. He stated during his deposition that he sent the request by fax to the company and "was granted that." Then, at the trial in this case, he testified that he never took a leave of absence, and that he did not recall saying that he had requested a leave of absence in his deposition. (Trial Tr. 1-11-2010 P.118 L.21-P.119 L.25). He was asked, "[d]o you recall telling anyone at Total Lock on this last trip to Kansas, I believe it was, that you did not think this job was for you, and I'm not going to do this anymore. Have you ever had any conversation like that with anyone?" Mr. Brandt answered, "I had a conversation with one of the other installers. I'm not sure it was in Kansas. It

might have been." (Trial Tr. 1-11-2010 P.120 L.5-12). According to Mr. Brandt, the last time he was paid by the Total Lock/Installers was October 2007. He testified that he took time off in October and never again worked for Total Lock/Installers. He never thereafter drew another paycheck from them. (Trial Tr. 1-11-2010 P.120 L.1-4; P.220 L.20-P.121 L.2). He testified that he was told by Installers that they were working on finding a location for him to go out on. (Trial Tr. 1-11-2010 P.121 L.5-11).

On examination of Defendants' counsel, Mr. Brandt testified that he began his employment with Total Lock on June 4, 2007, working the next four to five months out of town, with an occasional weekend at home. He said that after working those four or five months continuously out of town, he submitted a facsimile transmission, requesting time off at Thanksgiving, with one week off as soon as possible. That request was granted. When he returned to the company from his out of town job, Mike Noel drove him home. Mr. Brandt said that he contacted Eve Rone just before Thanksgiving, asking when he was going to be dispatched on his next assignment. He testified that Ms. Rone responded that she would get back to him as soon as it was convenient. (Trial Tr. 1-11-2010 P.154 L.25-P.156 L.16). He said that at no time before the accident did any supervisor, including Eve Rone, Joe Merx, John McGeehan, Michelle "Gidget" Fogerty, or anyone else at Total Lock/Installers, ever notify him that he had been terminated or that he no longer worked for Total Lock. He also said that, prior to the accident, no one from Total Lock/Installers had ever told him that they heard that he had quit. Mr. Brandt testified that, at the time of the accident, he believed that he was still employed by Total Lock, and that he had authority to drive Total Lock vehicles. (Trial Tr. 1-11-2010 P.156 L.17-P.157 L.13).

The automobile accident occurred on November 26, 2007. A few days before the accident, Mr. Brandt was staying at a Comfort Inn hotel that was located near the Bunches' home. On November 25, 2007, the Bunches picked Mr. Brandt up from the hotel, and he stayed at their home that night. In his deposition, Mr. Brandt stated that it was Mr. Bunch who picked him up from the hotel, but at trial he testified that his deposition testimony was mistaken and it was Mrs. Bunch who drove the car from the Comfort Inn to the Bunch residence. (Trial Tr. 1-11-2010 P.126 L.21-P.128 L.15). However, Mr. Brandt was very specific in his deposition testimony, stating on page 29, lines 13-25 of his deposition transcript, "[a]ctually, I would like to change that, because there was one instance that I observed Don driving the vehicle[, on] November 25th." (Trial Tr. 1-11-2010 P.129 L.14-18). Mr. Brandt further testified in his deposition that Mr. Bunch "picked me up from the hotel and brought me [to the Bunches' house]" on the day before the accident. When asked the type of vehicle Mr. Bunch drove, Mr. Brandt replied, "[i]t was a Jeep Liberty." At trial, Mr. Brandt admitted that he was changing his deposition testimony, "[a]s far as Don being the one driving."(Trial Tr. 1-11-2010 P.130 L.19-P.131 L.4).[4]

Mr. Brandt was staying at the Comfort Inn instead of at the Bunches' house because they had some family members visiting and, as he testified, "there's still some animosity between me and a couple of the family members." (Trial Tr. 1-11-2010 P.131 L.9-17). After leaving the hotel on November 25, 2007, he believes he arrived at the Bunch home around 8:20 or 8:25 p.m. He testified that while he was staying at the hotel, he had purchased a thirty-pack of beer, and he

---

[4]All agree that Mr. Bunch had no permission to drive a Total Lock/Installers vehicle under any circumstances.

transported it in the Jeep Liberty from the hotel to the Bunch house in a cooler. He testified, "I removed my bags and I removed the cooler, and put [the beer] in the refrigerator." He said the refrigerator was in the garage, where they kept the beer and alcohol. He testified that the Bunches did not typically keep beer on hand, and that Mr. Bunch "very seldomly" drank. (Trial Tr. 1-11-2010 P.133 L.22-P.135 L.15).

Mr. Brandt testified that he went to bed on November 25, 2007, and awoke the next day around 10:00 a.m. He testified that he had a couple of beers and noticed that the Bunches were moving around, preparing to leave for Washington D.C. the next day. They were doing laundry and repacking the truck. When asked again about the number of beers he had between 10:00 a.m. and 12:00 p.m., he said "[i]t couldn't have - - I would say anywhere between four and six. I didn't count." He agreed that it was quite possible that he drank six beers. At some point between 12:00 and 12:30 p.m., he laid down and took a nap. (Trial Tr. 1-11-2010 P.135 L.24-p.136 L.22). Mr. Brandt testified that he did not feel he was under the influence of alcohol when he went to sleep, but when later asked by counsel if he felt intoxicated before his nap, Mr. Brandt responded, "[a] little bit. A little woozy." He awoke from his nap between 3:00 and 3:30 p.m., at which time he said he felt fine. (Trial Tr. 1-11-2010 P.138 L.19-25; P.171 L.10-14).

Mr. Brandt said he then went downstairs for dinner, finishing at about 4:00 p.m. Between 4:00 and 6:30 p.m., he helped Mr. Bunch reload the truck, during which time he opened another beer. He testified that he only had one more beer after he woke up from his nap. Around 6:00 or 6:30 p.m., Mrs. Bunch asked Mr. Brandt to drive Mr. Bunch to Mr. Bunch's mother's house. Mr. Brandt did not want to go to Mr. Bunch's mother's house because she and Mr. Brandt did not get along, but he eventually agreed. (Trial Tr. 1-11-2010 P.139 L.4-P.140 L.25). Mr. Brandt

also testified that Mrs. Bunch also asked him to stop to fill up the Jeep Liberty so that they would be ready to leave on their trip to Washington D.C. the next day.  (Trial Tr. 1-11-2010 P.170 L.7-17).   Mr. Brandt testified that when Mrs. Bunch asked him to drive, he knew that he did not have permission to drive a company vehicle after drinking.  (Trial Tr. 1-11-2010 P.141 L.8-15).  Mr. Brandt testified that he is sure that Mrs. Bunch did not see him drink the one beer he had between the time when he woke up from his nap and when Mrs. Bunch asked him to take Mr. Bunch to his mother's house.  He stated that Mrs. Bunch asked him to drive Mr. Bunch because she had laundry to attend to, and because she was tired.  (Trial Tr. 1-11-2010 P.171 L.10-P.172 L.7).

Mr. Brandt testified that it took approximately 20 to 25 minutes to get from the Bunches' home in Arnold, Missouri to Mr. Bunch's mother's home in Hillsboro, Missouri.  (Trial Tr. 1-11-2010 P.144 L.7-18).  When they arrived at Mr. Bunch's mother's home, Mr. Brandt drank two beers while sitting around the kitchen table, which Mr. Bunch observed.  The men were at Mr. Bunch's mother's home for approximately fifteen minutes.  Before leaving, they took two additional beers with them, placing them in a cooler in the Jeep Liberty.  Mr. Brandt testified that neither he nor Mr. Bunch drank those two beers.  (Trial Tr. 1-11-2010 P.146 L.14-P.148 L.15).  They departed at approximately 7:10 p.m.  (Trial Tr. 1-11-2010 P.145 L.14-22).

The automobile accident occurred at about 7:36 p.m. on November 26, 2007, approximately fifteen or twenty minutes after Mr. Brandt and Mr. Bunch left the home of Mr. Bunch's mother.  (Trial Tr. 1-11-2010 P.144 L.19-P.145 L.13).  Mr. Brandt admitted that on November 26, 2007, he drank nine beers between the time when he woke up (10:00 a.m.), and the time of the accident (7:36 p.m.).  (Trial Tr. 1-11-2010 P.148 L.19-P.149 L.18).  Mr. Brandt testified that if, as suggested by the toxicologist, he had consumed six to nine additional beers

before leaving the Bunch house, he knew not to get into the car with the keys. He also knew that he would not have had permission from Total Lock/Installers to drive their car that night. He said he knew that when he was at Mr. Bunch's mother's house, after drinking two beers, he would not have permission to drive the vehicle, because he was drinking beer. (Trial Tr. 1-11-2010 P.153 L.13-P.154 L.18).

Mr. Brandt testified that he believed that he had the permission of Total Lock/Installers to drive the Jeep Liberty because he had authority from Total Lock to drive its vehicles, and because the Bunches worked for the same company. He said that no one at Total Lock ever told him otherwise. He testified that he did not feel intoxicated when Mrs. Bunch handed him the keys to the vehicle, and he did not feel intoxicated when he left her house. He testified that no one from Total Lock/Installers ever told him he should not have been driving a company vehicle, but he admits that Gidget Fogerty had told him that it was against company policy to drink and drive. (Trial Tr. 1-11-2010 P.172 L.8-11; L.24-P.174 L.25). Mr. Brandt testified that no one from Total Lock told him after the accident that he should not have been driving the vehicle because he had previously been fired or terminated from employment, or that he was not a company employee at the time of the accident. (Trial Tr. 1-11-2010 P.175 L.1-24). Notwithstanding Mr. Brandt's understanding as to his employment, he still testified that he knew he did not have permission to operate company vehicles if he had been drinking, and confessed that he drank nine beers on November 26, 2007.

Mr. Brandt testified that he recognizes that he was legally intoxicated at the time of the accident, but claims that he did not feel intoxicated. He said he plead guilty because the BAC showed "legal intoxication." (Trial Tr. 1-11-2010 P.176 L.8-24). He testified that when he was

drinking inside the Bunch house on November 26, 2007, he was drinking openly, "periodically," and in close proximity to both Mr. and Mrs. Bunch.[5] (Trial Tr. 1-11-2010 P.179 L.20-P.180 L.2). Mr. Brandt testified that if either Mr. Bunch or Mrs. Bunch knew on November 26, 2007, that he had been drinking that afternoon, he would not have had permission to take the keys and get into the car. (Trial Tr. 1-11-2010 P.183 L.25-P.184 L.6).

### D.    TESTIMONY OF BRUCE WILLIAMS

Bruce Williams is an installer for The Installers Company. He works nationwide, installing locks in hotels. (Trial Tr. 1-11-2010 P.187 L.13-P.188 L.7). He was hired in June 2006, and was told by Ms. Fogerty that the company policy was that drinking and driving was not permitted. (Trial Tr. 1-11-2010 P.189 L.4-6; P.190 L.18-P.191 L.1; P.192 L.7-11). He testified that Ms. Fogerty told him that he could take a company vehicle home only after getting permission from her. He said that the standard policy was that the company vehicle was to be left at the office upon returning to St. Louis. (Trial Tr. 1-11-2010 P.193 L.4-14). During the proffer of this testimony, there were several objections. Very little weight is ascribed to his testimony.

### E.    TESTIMONY OF MICHELLE "GIDGET" FOGERTY

Ms. Fogerty started and is the sole owner and president of The Installers Company and Total Lock & Security, Inc. She first started Installers out of her home in 1997, with her brother, John McGeehan. Ms. Fogerty and Mr. McGeehan were the only employees of Installers at that time. (Trial Tr. 1-11-2010 P.206 L.25-P.207 L.10; P.207 L.20-P.208 L.3; P. 208 L.12-25; P.209 L.22-P.210 L.2). Ms. Fogerty started Total Lock in 1999. The nature of Total Lock's business

---

[5]Both Mr. and Mrs. Bunch testified that neither saw Mr. Brandt drinking alcohol in their house on November 26, 2007.

is much broader than that of Installers. More specifically, Total Lock does "anything with opening, locks, frames, storefronts, anything with the door opening." (Trial Tr. 1-11-2010 P.209 L.5-14). The current address for Total Lock/Installers is 11772 Westline Industrial Drive, St. Louis, Missouri. (Trial Tr. 1-11-2010 P.210 L.25-P.211 L.6). At the time of the hearing in this case, Total Lock employed between 35 and 40 individuals, and Installers employed five. (Trial Tr. 1-11-2010 P.211 L.23-P.212 L.5). Ms. Fogerty testified that salespeople, service techs, and managers employed by Total Lock are allowed to take company vehicles home. These employees are all dispatched from their home to save time, so that they don't have to stop in at the office before an appointment. (Trial Tr. 1-11-2010 P.214 L.5-25). According to Ms. Fogerty, in 2007, Eve Rone was the dispatcher. (Trial Tr. 1-11-2010 P.212 L.22-24).

Ms. Fogerty acknowledges that the Jeep Liberty that was involved in the accident was registered to Total Lock, but it was being used by an Installers employee. Total Lock had purchased the Jeep Liberty in conjunction with plans being made to start a company in Kansas City, but the expansion did not materialize. The Jeep Liberty was purchased for the use of the prospective company, and it did not meet the needs of Total Lock's business in St. Louis. Because the vehicle was just sitting there, it was leased to Installers, for use by its employees. Ms. Fogerty characterized the arrangement as a unique situation in which an Installers employee would use a Total Lock vehicle. (Trial Tr. 1-11-2010 P.217 L.1-25).

Ms. Fogerty testified about the policies of Installers regarding the use of company vehicles. Since the origin of the company, one policy was "no drinking and driving." (Trial Tr. 1-11-2010 P.218 L.4-12). Ms. Fogerty testified that the reason driving and drinking is not allowed is because her insurance does not allow it. (Trial Tr. 1-11-2010 P.283 L.8-20). There was also a

company policy regarding personal use of company vehicles in St. Louis; specifically, that "they didn't drive them personally." (Trial Tr. 1-11-2010 P.219 L.20-24). When employees of Installers arrived in St. Louis late at night, they were permitted to take the company vehicle they were driving to their residence, and bring the vehicle back the next day. There was no Installers parking lot, so Installers employees brought the vehicles to the Total Lock parking lot. (Trial Tr. 1-11-2010 P.220 L.8-22). When there was a crew, keys were issued to the members of the crew, and only members of that crew were allowed to operate the assigned vehicle. These company policies were not in writing when the accident occurred. (Trial Tr. 1-11-2010 P.222 L.2-15).

Ms. Fogerty testified that in 2006, Mr. and Mrs. Bunch presented themselves for employment in response to an advertisement posted by Installers. Ms. Fogerty interviewed them at the current office address. She asked them if they both had a driver's license and a clean driving record, and she verified that they did not drink and drive. According to Ms. Fogerty, "Don said he didn't drink, and so did Patricia." Mr. Bunch did not tell her that he had been charged with a DWI in 2005. After the interview, she hired both Mr. and Mrs. Bunch as lock installers with Installers. Later, in March 2007, Ms. Fogerty learned from her insurance company that Mr. Bunch had a prior DWI. When Ms. Fogerty explained to Mr. Bunch that he would not be allowed to drive company vehicles any longer, Mrs. Bunch said that they needed the job and that she would drive. (Trial Tr. 1-11-2010 P.226 L.16-P.229 L.19).

Ms. Fogerty was involved in the hiring of Mr. Brandt, whom she met through Mr. and Mrs. Bunch. (Trial Tr. 1-11-2010 P.229 L.24-P.230 L.3). She told Mr. Brandt about the company's policy "that there's no drinking and driving, [and no] drugs." When asked if she had advised Mr. Brandt regarding the personal use of company vehicles, she replied, "[w]e weren't

letting him take it home at that time, so I couldn't say if we were or not." Ms. Fogerty testified that she had no information prior to the November 26, 2007 accident that Mr. Brandt had ever used a company vehicle for personal use in St. Louis, and she further stated that she never granted Mr. Brandt authority to use a company vehicle for personal use in St. Louis. Ms. Fogerty also testified that she was unaware of any instances prior to the accident in which Mr. Brandt consumed alcohol and then operated an Installers vehicle. (Trial Tr. 1-11-2010 P.231 L.7-P.232 L.2).

There is no dispute that the crew assigned to the Jeep Liberty consisted of Mr. Bunch and Mrs. Bunch, and that only Mrs. Bunch had permission to drive that vehicle. Ms. Fogerty testified that when the Bunches were first hired, they had the exclusive use of a Ford Ranger,until the company made the switch to the Jeep Liberty. Ms. Fogerty stated that when the Bunches were on the road out of St. Louis, they had "broad and unfettered use of the Jeep Liberty," so long as there was no drinking or drug use. When the Bunches returned from their trip working out of St. Louis on Wednesday, November 21, 2007, after being out on the road for seven or eight months, they returned late and had authorization to take the Jeep Liberty home. The next day was Thanksgiving, so the Bunches were not supposed to return the Jeep Liberty until Friday, November 23, 2007. Ms. Fogerty testified that she allowed the Bunches to use the vehicle for a personal use around Thanksgiving, specifically to purchase food. (Trial Tr. 1-11-2010 P.259 L.4-P.261 L.17).

On November 23, 2007, the day after Thanksgiving, Ms. Fogerty had a meeting in her office with Mr. and Mrs. Bunch. She said that they were at the office because they had brought a vehicle back after getting home late from a job. (Trial Tr. 1-11-2010 P.235 L.5-17). At that

meeting, Mrs. Bunch asked to take the vehicle home because they were leaving early on a job, and she did not like driving at night. John McGeehan, who was present at the meeting, said that he needed to take the vehicle to Jiffy Lube for service. The Bunches explained that they needed to renew the license for their car, so Mr. McGeehan would need to take them home and pick them up if the company vehicle was being serviced. Mr. Bunch then suggested that they could take the vehicle to Jiffy Lube, to have it repaired. (Trial Tr. 1-11-2010 P.236 L.16-P.237 L.10). Ms. Fogerty told the Bunches that they could take the company vehicle to Jiffy Lube, get it filled with gas, and then leave it parked until they left for their next job. She did not give them permission to drive the vehicle for their personal use over that weekend. Mr. Bunch asked when he would be allowed to drive company vehicles, and Ms. Fogerty told him that he would not be allowed to do so until the insurance company told her that it was "okay." She then reminded the Bunches that Mrs. Bunch was the only person on the crew who was allowed to drive. (Trial Tr. 1-11-2010 P.237 L.23-P.238 L.20). Ms. Fogerty testified that she remembered this conversation clearly because "Don asked me when he was able to drive the car," and because ordinarily lock installers talk to Eve Rone, and not to her. (Trial Tr. 1-11-2010 P.254 L.12-P.255 L.1).

Ms. Fogerty testified that the Bunches agreed that they would not use the vehicle for personal use, and that the vehicle would remain parked in their driveway until they departed on their trip. She reviewed the receipt from Jiffy Lube, and acknowledged that the Bunches did take the vehicle to Jiffy Lube in Arnold. (Trial Tr. 1-11-2010 P.239 L.1-17) (Plaintiffs' Exhibit No.12). She also acknowledged that the Bunches filled the vehicle with gas almost immediately after leaving her office. (Trial Tr. 1-11-2010 P.241 L.14-19) (Plaintiffs' Exhibit No.13).

Ms. Fogerty learned of the accident from John McGeehan, her brother, who "does the warehouse and the fabrication of the warehouse, and he takes care of the company vehicles." (Trial Tr. 1-11-2010 P.245 L.13-P.246 L.1). Ms. Fogerty testified that Mrs. Bunch called her after the accident, and reported that Mr. Bunch had spent the night in the hospital. Ms. Fogerty explained that "we originally thought that [Mr. Bunch] was the driver of the vehicle. [Mr. Brandt] didn't really come to our mind when we found out about the accident." Ms. Fogerty asked Mrs. Bunch why the vehicle was being operated on that day, and Mrs. Bunch told her that they were going to the filling station to refuel the vehicle. Ms. Fogerty testified that when she questioned Mrs. Bunch further, reminding her that they had filled the vehicle on Friday, Mrs. Bunch "changed her story and said that they were taking over food to [Mr. Bunch]'s mother because she didn't want the food to waste while they were on their trip." When Ms. Fogerty questioned Mrs. Bunch about alcohol, Mrs. Bunch told her that Mr. Bunch's mother had given them a six pack of beer; that Mr. Brandt had "slammed a couple beers and that had raised his blood alcohol in his body, but he wasn't really drunk." Ms. Fogerty asked Mrs. Bunch why Mr. Brandt was driving the vehicle, and Mrs. Bunch told her that it was raining and icing and she did not like to drive at night.[6] Mrs. Bunch told Ms. Fogerty that Mr. Brandt was going to get out of his DWI because he was not drunk. (Trial Tr. 1-11-2010 P.246 L.22-P.247 L.5; P.247 L.12-P.249 L.1). Ms. Fogerty testified that she also talked to Mr. Brandt after the accident. She asked him what was their number one rule, and he responded, "no drinking and driving." She then asked him why he did it and he didn't answer. (Trial Tr. 1-11-2010 P.249 L.9-22).

---

[6]At trial, Mrs. Bunch testified that she did not drive to Mr. Bunch's mother's house because she had too much to do in getting ready to leave for the Washington D.C. trip.

After the Jeep Liberty was towed, Ms. Fogerty went to the car lot to get Mr. Bunch's glasses and medication from the car. She testified that she also wanted to see the vehicle. On the interior of the vehicle, she found a couple of beers in a cooler, and two or three empty beer cans on the front floorboard. (Trial Tr. 1-11-2010 P.250 L.7-P.251 L.24). Ms. Fogerty identified a tow receipt, which listed the mileage of the Jeep Liberty at 140,803 miles. Ms. Fogerty testified that when the vehicle was filled with gas on November 23, 2007, the mileage of the Jeep Liberty was 140,636 miles, for a difference of 167 miles.[7] (Trial Tr. 1-11-2010 P.252 L.7-P.253 L.2) (Plaintiffs' Exhibit No.15). Ms. Fogerty testified that there was no business purpose for those additional miles, and that the Bunches did not have the permission of Installers to drive the vehicle when those additional miles were incurred. (Trial Tr. 1-11-2010 P.253 L.18-23).

Ms. Fogerty testified that, as far as she knows, the last time that Mr. Brandt was employed by Installers was in October of 2007. When asked if he had been paid any wages after his last day of work, she said, "[n]ot that I know of." She also said that Mr. Brandt was not given permission to use Installers vehicles or any company equipment after October 26, 2007. (Trial Tr. 1-11-2010 P. 232 L.3-P.233 L.4; P.234 L.13-15). Ms. Fogerty testified that when Mr. Brandt was employed by Installers, he was authorized to drive company vehicles. She said that before November 26, 2007, "no one at Total Lock ever notified Daniel Brandt that he was fired." Additionally, prior to November 26, 2007, no one at Total Lock told her that Daniel Brandt was quitting his

---

[7]There was some confusion at the trial as to what was the actual difference in mileage. The Parties seemed to agree that the mileage was 140,636 when the vehicle was filled up on November 23, 2007, and 140,803 at the tow lot after the accident on November 26, 2007. Although the Parties discussed the difference to be 141 miles, the actual difference is 167 miles. As the Court noted at the hearing, "Never trust a lawyer doing math." (Trial Tr. 1-11-2010 P.253 L.6).

employment. Ms. Fogerty confirmed that before November 26, 2007, no one at Total Lock terminated Mr. Brandt's authority to drive company vehicles, and no one had advised the Bunches that Mr. Brandt had been fired, had quit, or no longer had permission to drive company vehicles. (Trial Tr. 1-11-2010 P.266 L.4-267 L.15).

Defendants' Exhibit B is a copy of a facsimile transmission dated December 3, 2007, sent from a number at Installers to the Festus Police Department. Ms. Fogerty was not sure whether the document, which bears her name, was sent by her authority or whether she had prepared it. She testified that if Eve Rone was the person who sent the fax, she had the authority to do so. (Trial Tr. 1-11-2010 P.276 L.25-P.278 L.6; L.20-P.279 L.14). The text of the fax reads:

> The 2004 Jeep Liberty that was involved in the accident on 11/26/07 was released to our employee Patricia Bunch. The driver, Daniel Brandt, is one of our employees but he was not given the vehicle. Please feel free to call with any questions. Thank you. Gidget Fogerty

(Trial Tr. 1-11-2010 P.279 L.19-P.280 L.1) (Defendants' Exhibit B). Ms. Fogerty testified that as of December 3 and December 6, 2007, it was her belief that Mr. Brandt was still one of her employees. (Trial Tr. 1-11-2010 P.281 L.10-15). Based on the totality of the evidence, the Court concludes that Mr. Brandt was an employee of Installers at the time of the accident on November 26, 2007.

Ms. Fogerty testified that no employee had the authority to ask another employee to operate a company vehicle, without first obtaining her permission. She also testified that Mrs. Bunch was not given permission by Installers to allow other people to operate the Jeep Liberty on the night of the accident, or at any other time. (Trial Tr. 1-11-2010 P.290 L.4-7; L.24-P.291 L.7). Ms. Fogerty stated that the permission given by Installers to Mr. Brandt to drive company

vehicles was limited to times when he was actually working.  (Trial Tr. 1-11-2010 P.291 L.21-P.292 L.1).  According to Ms. Fogerty, Installers did not have knowledge that Mr. Brandt would be driving the Jeep Liberty on November 26, 2007.  (Trial Tr. 1-11-2010 P.292 L.20-22).

### F.    TESTIMONY OF PATRICIA BUNCH

Mrs. Bunch has lived in Arnold, Missouri since 2007, with her husband, Donald Bunch, her daughter, and Daniel Brandt.  According to Mrs. Bunch, Mr. Brandt has lived with them "on and off for several years."  She explained, "[w]e just sort of protect him."  Mr. Brandt has lived with the Bunches since they started working for Installers, and he was living with them on the date of the accident.  (Trial Tr. 1-12-2010 P.4 L.16-P.5 L.21).

Mrs. Bunch testified that Installers has a policy that no company vehicle should be operated after drinking any amount of alcohol, and she agreed that it has been referred to as a zero-tolerance policy.  She stated that she knew of the zero-tolerance alcohol policy before the accident, she knew that Mr. Bunch knew of the zero-tolerance alcohol policy before the accident, and she knew that Mr. Brandt knew of the zero-alcohol tolerance policy before the accident.  (Trial Tr. 1-12-2010 P.5 L.22-P.6 L.22).  Mrs. Bunch agreed that if Mr. Brandt had been drinking beer the evening of the accident, before he drove, he should not have been driving the vehicle that night.  She also agreed that she should not have given him the keys to drive the vehicle if she knew that he was drinking alcohol that night.  She knew that Installers would not have given her permission to give him the keys if he had been drinking, and she knew that Mr. Brandt "could not have accepted those keys if he would have been drinking that night."  She confirmed that "[h]e would have had no permission from Installers Company to be driving a company vehicle after consuming any amount of alcohol."  (Trial Tr. 1-12-2010 P.6 L.23-P.7 L.1; P.7 L.20-P.8 L.22).

This testimony contradicts the later testimony of Mr. Bunch, who stated that he did not know of the no drinking and driving policy or the zero tolerance to alcohol policy at Installers.

Mrs. Bunch testified that when Ms. Fogerty interviewed her and Mr. Bunch for a job, the question about Mr. Bunch's DWI never came up. (Trial Tr. 1-12-2010 P.10 L7-18). According to Mrs. Bunch, when she and Mr. Bunch were first interviewed, they were asked if they had valid driver's licenses, and they both responded that they did. She said that they were not asked about whether they had a history of driving while intoxicated. (Trial Tr. 1-12-2010 P.71 L.18-P.72 L.5). Mrs. Bunch stated that when Ms. Fogerty later learned of Mr. Bunch's DWI, "[s]he gave me the keys and told me that I would drive." Ms. Fogerty also told Mrs. Bunch that she was the only one that was permitted to drive the company vehicle that was assigned to them. (Trial Tr. 1-12-2010 P.10 L.19-P.11 L.4).

Mrs. Bunch testified that they were trained by John McGeehan, who gave them on-the-job training during various trips to Louisiana, Washington, and California. On some of these training trips, Mr. McGeehan would ride with the Bunches as a passenger. When Mr. McGeehan rode with the Bunches as a passenger, they did not take the company vehicle back home with them after arriving in St. Louis. (Trial Tr. 1-12-2010 P.11 L.5-P.12 L1).

The first vehicle assigned to the Bunches was a Ford Ranger truck with a stick shift, which Mrs. Bunch could not operate. Mrs. Bunch testified that when they received the keys for the vehicle, nothing was said about personal use of the vehicle. She further testified that Ms. Fogerty encouraged the personal use of vehicles by employees who were out of town, telling them that when they had down time, she did not want them to stay in their motel room and get bored, but that they should go out and see what was around. (Trial Tr. 1-12-2010 P.74 L.3-P.75 L.4). Mrs.

Bunch said that after going out on trips, when they returned to St. Louis, they kept the Ford Ranger at their home. She said they used it exclusively, except a couple of times when they had to switch it out to let another crew use it. She testified that Ms. Fogerty gave them no restrictions on using the Ford Ranger in the St. Louis area while they were at home and not on a job. (Trial Tr. 1-12-2010 P.77 L.1-21). Mrs. Bunch testified that when they had the Ford Ranger at home with them in St. Louis, she would be talking to Ms. Fogerty by telephone and mention that she needed to go to the grocery store "or something," and Ms. Fogerty would say, "go." Mrs. Bunch said that this type of conversation happened more than one time. (Trial Tr. 1-12-2010 P. 75 L.15-P.76 L.5). The Bunches were switched from the Ford Ranger to the Jeep Liberty after Ms. Fogerty informed them that Mr. Bunch could no longer drive because of his DWI, since Mrs. Bunch would be doing all of the driving and could not operate a stick shift. (Trial Tr. 1-12-2010 P.80 L.2-9).

Mrs. Bunch claims that she and Mr. Bunch had unfettered personal use of the company vehicles that were assigned to them while they were employed at Installers. (Trial Tr. 1-12-2010 P.12 L.2-6). This is totally inconsistent with credible evidence in the case. All credible evidence supports the conclusion that company vehicles were to be returned to the Installers parking lot when installers returned to St. Louis from out-of-town jobs, and that vehicles were not to be taken home unless an installer returned to St. Louis late at night or when the employee obtained expressly granted permission by someone with authority. Mrs. Bunch testified that she did not remember having any conversations with Ms. Fogerty or anyone else at the company regarding the personal use of company vehicles. She stated that "[a]t the time we never discussed personal use until we were on the road. Then we discussed personal use entirely, personal use, all the

24

time."  She also testified that "[m]y employer told me that I could use the vehicle while in St. Louis.  That was when we lived on Annette, before we moved to . . . Heritage Hills."  (Trial Tr. 1-12-2010 P.12 L.7-P.13 L.2; P.14 L.2-4).  Mrs. Bunch agreed that she testified in her deposition that she did not remember having any conversations with Ms. Fogerty regarding the personal use of company vehicles.  (Trial Tr. 1-12-2010 P.105 L.3-13).

Upon redirect examination by Mr. Wolf,  Mrs. Bunch admitted that when the Bunches were using the Ford Ranger, she had a telephone conversation with Ms. Fogerty and "[s]he was, she was on the phone and I told her I had to go to the grocery store and my car wasn't there.  She said, go to the grocery store."  She admitted that, in that instance, Ms. Fogerty had granted her express permission.  (Trial Tr. 1-12-2010 P.94 L.19-P.95 L.17).  It is notable that the Bunches were away from St. Louis on many long trips soon after they were employed.  They were in St. Louis infrequently.  Any suggestions by Mrs. Bunch that they had unfettered use of company vehicles at their house for personal use is inconsistent with physical facts and credible evidence.

For the entire time that they worked for Installers, including the time of the accident, the Bunches owned a 1997 Nissan Maxima.  (Trial Tr. 1-12-2010 P.9 L.7-18).  Mrs. Bunch testified that when they initially began their employment with Installers , they drove their personal vehicle to the office in Maryland Heights and left it there while they were away on their trip.  She went on to say that when they returned home from their work trip, they would take the company vehicle home, and leave their Nissan Maxima at the office.  (Trial Tr. 1-12-2010 P.15 L.23-P.16 L.9).  Mrs. Bunch testified that while they were on their first out-of-town assignment with Installers, they left the Nissan Maxima at the office.  After two or three months, Ms. Fogerty suggested that they take it to their house because the sun was fading it.  (Trial Tr. 1-12-2010 P.92 L23-P.93

L.16). Several months prior to the accident, the Bunches loaned their Nissan Maxima to Mrs. Bunch's daughter, Kendra, whose car was not working at the time. Mrs. Bunch testified that she told Ms. Fogerty and Mr. McGeehan that they could not use their Nissan Maxima, and they knew that the Nissan Maxima was with Kendra. (Trial Tr. 1-12-2010 P.66 L.10-P.67 L.15). She admitted that she never expressly told her employer that they did not have a personal vehicle available for use. (Trial Tr. 1-12-2010 P.48 L.9-17). When questioned further about the seven- or eight-month period during which the Bunches were on a trip using the Jeep Liberty, and her belief that she had told Ms. Fogerty and Eve Rone that they did not have a personal vehicle, Mrs. Bunch stated, "[t]hey knew we didn't have a personal vehicle." When she was asked, "[y]ou never actually told them that; right?," she answered, "[s]omewhere along the line, I guess someone did." A question followed, "[b]ut not you, personally, though, right?" She answered, "I don't remember." (Trial Tr. 1-12-2010 P.101 L.2-13).

At trial, Mrs. Bunch could not recall whether her employer gave her express permission prior to the accident to allow others to drive the Jeep Liberty or any other company vehicle. However, she confirmed that she had answered "[n]o, sir" to the deposition question, "[d]id they ever give you express authority to allow others to drive the vehicle before this accident?" (Trial Tr. 1-12-2010 P.16 L.16-P.17 L.1). She was then specifically asked, "you did not believe you had permission from Installers while you were here in St. Louis to allow anyone else to operate the company vehicle for personal use, did you?" She answered, "[i]f it was my neighbor, I would say no, it's a company vehicle. If it was an employee of Installers Company or Total Lock, I would give permission and, to let them drive." Then she was shown this deposition question and answer: "When you're not at work, when you're not on the road working, you're here in St.

Louis at your house, did you believe that you had authority to loan that vehicle or allow someone else to operate it for personal use?" She answered, "[n]o sir." (Trial Tr. 1-12-2010 P.1 L.10-P.19 L.3). Mrs. Bunch gives the Court the clear impression that she will say anything, irrespective of her oath obligation, to gain insurance coverage for her husband.

Mrs. Bunch testified that she had never permitted Mr. Brandt or anyone else to drive the Jeep Liberty before the accident. (Trial Tr. 1-12-2010 P.19 L.4-15). The Jeep Liberty was assigned to the Bunches about eight months before the accident, around the time when Ms. Fogerty found out about Mr. Bunch's prior DWI. The Bunches were on the road the entire eight-month period before the accident, and Mrs. Bunch testified that she permitted no one to operate the Jeep Liberty during that time. (Trial Tr. 1-12-2010 P.19 L.16-P.20 L.17; P.21 L.12-17).

Mrs. Bunch stated that on or about October 29, 2007, they sent a facsimile transmission to Eve Rone, Gidget Fogerty and John McGeehan, asking if they could have some time off from November 18th or 19th through the 23rd or 24th. She noted that they needed to take care of their dog, get their car inspected, pay taxes and license their car. They ended the letter stating, "we love doing this." (Trial Tr. 1-12-2010 P.22 L.17-P.23 L.24) (Plaintiffs' Exhibit 8B).

Mrs. Bunch was asked whether John McGeehan had spoken with them while they were out of town before Thanksgiving, regarding the necessity of having the Jeep Liberty serviced. She responded, "[n]o, we told John that. We told John the Liberty needed to be maintained because we asked him about it." She was then shown the transcript of her deposition, in which she was asked, "They asked you to leave it there, right?," and she answered, "[i]n the beginning they did, because you said it needed to be maintained . . . , because the maintenance hasn't been done for like a long time. And John knew it was overdue, because he told us on the road. But

we brought the car home." She confirmed that was her deposition testimony. (Trial Tr. 1-12-2010 P.25 L. 4-20).

Mrs. Bunch testified that they did not make it back to St. Louis until November 21, 2007, and they arrived at Schnucks to do grocery shopping with their family for Thanksgiving at 10:00 p.m. She stated that Ms. Fogerty allowed them to take the vehicle home because they returned to St. Louis after business hours on November 21, and that they were allowed to keep the vehicle at their house the next day, which was Thanksgiving. Installers was closed on Thanksgiving Day. (Trial Tr. 1-12-2010 P.25 L.24-P.27 L.1). Mrs. Bunch said that after the Bunches finished the job in Nebraska, before returning to St. Louis on November 21, 2007, no one at Total Lock told them to return the vehicle to the office, or told them not to take the vehicle to their home. (Trial Tr. 1-12-2010 P.82 L.14-23). When asked if she was ever personally told by anyone at Installers that she had permission to drive the Jeep Liberty home the night of November 21, 2007, Mrs. Bunch said that she did not remember. She testified that she thought that Mr. Bunch called Ms. Rone because Mrs. Bunch was driving and it was dark and snowing. (Trial Tr. 1-12-2010 P.105 L.20-P.106 L.15).

Mrs. Bunch testified that she drove the Jeep Liberty to the Installers office on Friday, November 23, 2007, the first time anyone would have been there after the Holiday. The Installers office is located approximately thirty miles from the Bunches' home. Mrs. Bunch testified that they went to Installers on November 23 to talk about catering, to return equipment, and to replenish equipment for the next job. She explained that while they were still on the road, Ms. Fogerty had told her that she wanted to talk about catering for the Christmas Party, and they first discussed that when they arrived. Mrs. Bunch also testified that John McGeehan was going to

take the Jeep Liberty for service, because he already had an appointment.  However, when the Bunches arrived at Installers, they did not have alternate transportation, since they didn't get back in time to get their car licensed.  Then, Mrs. Bunch testified that she wasn't sure if Mr. McGeehan had actually made an appointment.  (Trial Tr. 1-12-2010 P.27 L.11-P.28 L.1; L.11-P.30 L.19). Later in her testimony, Mrs. Bunch denied going to the office for the purpose of returning the vehicle.  (Trial Tr. 1-12-2010 P.83 L.22-P.84 L.2).  Mrs. Bunch testified that Mr. McGeehan did not say that the Jeep Liberty was going to stay at the office because it needed to be serviced. Then, she was shown her deposition testimony where she answered, "[i]n the beginning, they did[,]" to the question, "[t]hey asked you to leave it there, right?"  She confirmed that was her deposition testimony.  (Trial Tr. 1-12-2010 P.31 L.4-15).

Mrs. Bunch testified that while they were at the office, she and Ms. Fogerty were talking when Mr. Bunch and John McGeehan came into the room, discussing maintenance for the Jeep Liberty.  Mr. McGeehan wanted to take it in for maintenance, but then learned that the Bunches did not have another car there.  Ms. Fogerty and Mr. McGeehan then decided to let the Bunches take the Jeep Liberty in for maintenance on the way to their house.  Mrs. Bunch testified that they took the vehicle to be maintained at a Jiffy Lube near their home.  Mrs. Bunch testified that she called back to the office twice because she had to determine if that Jiffy Lube was on the contract, and she had to obtain approval to put the maintenance charges on her issued credit card.  (Trial Tr. 1-12-2010 P.85 L.14-P.86 L.19)

Mrs. Bunch testified that while they were at the Installers office on November 23, 2007, nothing was discussed with Ms. Fogerty or Mr. McGeehan about the Bunches leaving on another trip the following week.  She claims that she is certain that the discussion about them going to

Washington D.C. did not occur until the morning of Sunday, November 25, 2007, when Eve Rone called Mrs. Bunch at her home, saying that the Bunches needed to leave for Washington D.C. right away because they had been specifically requested for a job. Mrs. Bunch testified that she told Ms. Rone that they could not leave before Tuesday because they had company and a lot of other matters to attend to. Mrs. Bunch stated that she is sure that Ms. Rone did not call about the Washington D.C. job while they were still on the road for their prior job. (Trial Tr. 1-12-2010 P.32 L.16-P.34 L.10; P.35 L.4-18).

Mrs. Bunch did not remember if they went directly to fill the Jeep Liberty with gasoline after leaving the Installers office on November 23, 2007. She was shown an exhibit which showed a fuel purchase transaction on November 23, 2007, at Petro-Mart Phillips, with the driver listed as Bunch, and the I.D. number listed as 1377, the number assigned to the Bunches. Showing Mrs. Bunch the exhibit did not refresh her recollection as to whether they filled the Jeep Liberty. She did testify that she remembered going to the Jiffy Lube in Arnold to service the Jeep Liberty. (Trial Tr. 1-12-2010 P.35 L.19-P.37 L.25) (Plaintiffs' Exhibit No.13). As noted in the testimony of Mr. Bunch, he vociferously maintains that they did not get gas at the Petro-Mart Phillips station in Creve Coeur, irrespective of the paper evidence to the contrary.

Mrs. Bunch testified that they went "a lot of places" in the Jeep Liberty on Saturday, November 24, 2007, because they had lot of people at their house. (Trial Tr. 1-12-2010 P.38 L.4-12). In response to a question as to whether Ms. Fogerty had ever expressed that Mrs. Bunch could drive the Jeep Liberty on personal errands on Saturday, November 24, 2007, Mrs. Bunch said, "Mrs. Fogerty didn't tell me anything." Mrs. Bunch testified that she does not think that anyone at Installers knew she was driving the Jeep Liberty on that date. In addition to the

driving on Saturday, Mrs. Bunch drove the Jeep Liberty to attend a religious service in Downtown St. Louis on Sunday, November 25, 2007. She denied that Mr. Bunch drove the Jeep Liberty to the Comfort Inn on Sunday night to pick up Mr. Brandt, and stated that she picked up Mr. Brandt. After being shown her deposition testimony, in which she said that she could not remember if she drove the Jeep Liberty any more that Sunday, Mrs. Bunch testified, "[t]hat day - - that was Sunday; correct? That day, I don't remember - - there's a lot of things I did that day and along with one of the things I probably did was go pick up Mr. Brandt." She then testified that she did actually remember picking Mr. Brandt up from the hotel. She stated that she was not sure what day she picked him up, but she was sure that she did pick him up at some point over a period of four days. (Trial Tr. 1-12-2010 P.38 L.22-P.40 L.16; P.43 L.12-21).

Mrs. Bunch testified that when she picked up Mr. Brandt at the Comfort Inn, she did not see the cooler of beer that Mr. Brandt said he placed in the Jeep Liberty at the hotel. She also testified that she did not see Mr. Brandt bring the cooler or the beer into her garage, nor did she see Mr. Brandt take the beer from the cooler and place it in the refrigerator in her garage. Mrs. Bunch agreed that Mr. Brandt should not have had alcohol in the Jeep Liberty, and that doing so would be a violation of company policy. (Trial Tr. 1-12-2010 P.44 L.3-P.45 L.3).

Mrs. Bunch testified that Eve Rone called the Bunch residence on Sunday morning, November 25, 2007, to inform them about a job in Washington D.C. Previously, Ms. Rone had them lined up for another job that would have required them to leave about a week later. However, someone from Washington D.C. had called, specifically requesting the Bunches for a job that would have required the Bunches to leave St. Louis on Monday, November 26, 2007. Mrs. Bunch said that she told Ms. Rone that they would go to Washington D.C., but they could

not leave Monday because they had company in the house and they had many other things to do. Mrs. Bunch said that she talked to Eve about washing clothes and getting the suitcases packed, and Mr. Bunch talked to her "about the food." (Trial Tr. 1-12-2010 P.86 L.20-P.88 L.1).

Mrs. Bunch admitted that on the morning of Monday, November 26, 2007, the day of the accident, she drove the Jeep Liberty to the grocery store for a personal matter. She agreed that all of the driving she had done in the Jeep Liberty from the time they left Jiffy Lube on Friday up until Monday was for her own personal benefit, and there was no business purpose for any of those trips. (Trial Tr. 1-12-2010 P.45 P.46 L.3). Mrs. Bunch testified that on November 26, she and Mr. Bunch talked to Eve Rone numerous times about getting on the road, but she never told Ms. Rone that she was going to use the Jeep Liberty to drop off food at Mr. Bunch's mother's house. (Trial Tr. 1-12-2010 P.51 L.4-13).

According to Mrs. Bunch, late in the afternoon on November 26, 2007, Mr. Bunch got some leftover food ready to take over to his mother's house, assuming that Mrs. Bunch would drive him in the Jeep Liberty to deliver the food. After he had the food ready to go, Mrs. Bunch told him for the first time that she would not be able to go. Mrs. Bunch then gave the keys to Mr. Brandt and asked him to drive Mr. Bunch to his mother's house to drop off the food. (Trial Tr. 1-12-2010 P.53 L.4-P.54 L.4). She said that she also told Mr. Brandt to gas up the Jeep Liberty on the way home. (Trial Tr. 1-12-2010 P.54 L.24-P.55 L.1). Mrs. Bunch testified that on the day of the accident, she did not see Mr. Brandt consume any alcohol. (Trial Tr. 1-12-2010 P.48 L.18-20). She also testified that she did not see any alcohol in the house that day.[8] (Trial Tr. 1-

---

[8]As already noted, Mr. Brandt testified that he drank that day closely to both Mr. and Mrs. Bunch.

12-2010 P.50 L.10-15). Mrs. Brandt testified that if she knew he had been drinking, she would not have given him the keys. She also said that Mr. Brandt was an arm's length away from her when she handed him the keys, and that she did not see any beer cans sitting around him. (Trial Tr. 1-12-2010 P.55 L.2-22). She testified that Mr. Brandt did not appear to be intoxicated, and that Mr. Brandt did not ask to borrow the Jeep Liberty, and he did not use it for personal use. She testified that when she gave the keys to Mr. Brandt, she believed he was an employee of Total Lock/Installers. (Trial Tr. 1-12-2010 P.91 L.1-P.92 L.1; P.92 L.14-17).

Mrs. Bunch agreed that no one at Installers knew that Mr. Brandt would be driving the Jeep Liberty, and that no one at Installers gave permission for Mr. Brandt to drive the Jeep Liberty. Mrs. Bunch admitted that she knew that Mr. Brandt had not done any work for Installers for about three weeks, and that he had been home during that time. (Trial Tr. 1-12-2010 P.56 L.17-P.57 L.6). Mrs. Bunch testified that when she handed the keys to Mr. Brandt, he was not slurring his words, his eyes were not "blurry" or red, she did not smell alcohol despite being within two feet of him, he was not staggering, he did not appear confused, and she did not believe he was intoxicated. (Trial Tr. 1-12-2010 P.57 L.7-P.58 L.17). She said she that never saw Mr. Brandt intoxicated during the time he lived with them. (Trial Tr. 1-12-2010 P.58 L.18-22). Mrs. Bunch agreed that if Mr. Brandt and Mr. Bunch were drinking alcohol at his mother's house, Mr. Brandt should not have been driving. She agreed that Mr. Bunch knew the company policy, and

that if he saw Mr. Brandt consuming alcohol, he knew Mr. Brandt should not have been driving.[9] (Trial Tr. 1-12-2010 P.62 L.8-17).

Mrs. Bunch testified inconsistently with respect to the issue of what she knew about the intent of Mr. Brandt and Mr. Bunch to get gasoline in the Jeep Liberty on the trip to Mr. Bunch's mother's house. In her deposition testimony, she could not remember if they were going to get gas. At the trial, however, she volunteered, without being asked, that she told them to get gas. At other times during the trial, she was certain beyond doubt that they were to get gasoline for the Jeep Liberty so it would be ready to go to Washington D.C. the next morning. She was reminded of her testimony that she and Mr. Bunch had stopped at the Petro-Mart station near her employer's office on Friday and filled the tank. She agreed that there was no business reason for using the vehicle prior to Monday, however, she testified that she considered the use of the vehicle to take food to Mr. Bunch's mother's house and to get gas to be a business use. She was asked, "[b]ut you would have had a full tank of gas though had you not driven it for personal use all weekend; right?" She responded, "I used it for personal use." She was reminded that there was a full tank of gas as of Friday, November 23, 2010, after the maintenance was done and was asked, "there was no reason to be going to get gas on Monday the 26th; right?" Mrs. Bunch responded, "I disagree." She said, "I disagreed because on Monday I asked them to get gas in the

---

[9]As discussed below, Mr. Bunch disclaims any knowledge of the company policy on drinking alcohol and driving. The Court concludes that Mr. Bunch, Mrs. Bunch and Mr. Brandt all clearly knew that Total Lock/Installers had a company policy of zero tolerance to drinking and driving, and that any employee who had been drinking alcohol had no permission to operate any vehicle owned by either Total Lock & Security or The Installers Company. Furthermore, the company policy was that no employee had permission, under any circumstances, to grant permission to another employee to operate a company vehicle, if the employee granting permission knew that the other employee had been drinking alcohol.

car. Because it takes gas to go to his mother's, and even if we need five gallons of gas, the car would be topped off and we would have a full tank the next morning." (Trial Tr. 1-12-2010 P.97 L22-P.99 L.5).

Mrs. Bunch testified that Mr. Bunch had told Eve Rone that food was going to be taken to his mother's house. Mrs. Bunch's state of mind at the time was that it was "okay to take food there because we had to be on the road and we couldn't use the food, so we had to take it to his mother's." (Trial Tr. 1-12-2010 P.68 L.20-P.69 L.11). Mrs. Bunch was asked, "[y]ou agree that dropping off the food at Mr. Bunch's mother's house was a personal errand; right?" She answered, "[y]es it was." (Trial Tr. 1-12-2010 P.59 L.10-12). Later, she contradicted this testimony when she stated, "I considered it a business." She was then asked, "It-- okay, you do now?" She responded, " I did then also." (Trial Tr. 1-12-2010 P.99 L.6-13).

Mrs. Bunch testified that she did not transport the food to Mr. Bunch's mother's house because she had tons of laundry to do, and she had to pack their suitcases. She explained that Mr. Bunch did not drive to his mother's house because he wasn't allowed to drive company vehicles, and he had not driven the Jeep Liberty since being told that he was not allowed to do so. Mrs. Bunch testified that she believed that any employee of Total Lock/Installers could drive any of the company vehicles because "[t]hey switched cars all the time." She believed that Mr. Brandt was an employee of Installers at that time. (Trial Tr. 1-12-2010 P.69 L.12-16; P.70 L.1-20). Mrs. Bunch testified that there was no on-the-job training as to whom, among the employees, could drive a Total Lock vehicle,[10] and everybody switched cars when it was necessary. "When

---

[10]This question was asked about Total Lock vehicles. The Court will assume for the analysis, that her answer would have been the same if the question included Installers vehicles.

someone needed one, when another crew needed one of the other cars, they would automatically switch it out without argument."  (Trial Tr. 1-12-2010 P.79 L.5-16).  Mrs. Bunch testified that "certain employees had to have certain automobiles at a certain time, so we could switch out on the road.  We - - whoever was nearby with the automobile, if they could take it at that time, or we would go to that location and switch it out with them."  She said that on numerous occasions, employees would operate a company vehicle other than that to which he or she was assigned. (Trial Tr. 1-12-2010 P.71 L.3-15).  Concerning switching vehicles, Mrs. Bunch was asked, "[y]ou weren't referring to switching out vehicles with other employees while you were here in St. Louis?"  She answered, "[n]o, we did not do that.  But it happens."  (Trial Tr. 1-12-2010 P.103 L.10-15).

Mrs. Bunch was asked if she considered Monday to be a work day and she said "[y]es." When Mrs. Bunch was asked whether she was paid for any of her activities on Monday, she responded, "[w]ell, it probably included my salary."  When asked if she was paid per lock installed, she said, "[y]es."  She admitted that she did not install any locks that day, and when it was suggested she was not paid for any work that she did that day, she answered, "I disagree." She continued to maintain that it was a workday, explaining, "I had company all day, and I didn't get a chance to visit with them because I had to fly around and do 50 other things, so I considered that a workday."  She stated that she also considered Monday to be a workday for Mr. Bunch "because he cleaned the whole car out."  It was then suggested to her that Mr. Bunch had consumed one and one-half beers on that Monday.  Mrs. Bunch testified that she did not see him drink and she never talked to him about whether he drank on that day.  (Trial Tr. 1-12-2010 P.107 L.18-P.108 L.24).

Mrs. Bunch was asked a series of questions about company policies. She testified that she agreed that if she knew Mr. Brandt had been drinking, she should not have given him the keys and allowed him to drive the company vehicle. She also said that if Mr. Bunch knew Mr. Brandt had been drinking, he should have never started the trip. In summary, Mrs. Bunch testified, "I agree. It would be breaking the rules." (Trial Tr. 1-12-2010 P.102 L.14-P.103 L.2).

The Court is more than just concerned about Mrs. Bunch's contradicting made-to-fit testimony. She is not a believable witness. It is the Court's impression that her focus on her husband's potential recovery has substantially overpowered her obedience to her oath.

## G.     TESTIMONY OF EVE RONE

Ms. Rone worked for The Installers Company and Total Lock & Security at the time of the events in question, through July 10, 2009. She was the National Coordinator for Installers, and the Public Relations Manager for Total Lock. As National Coordinator, she coordinated jobs for the installers and handled their day-to-day needs. Her job duties included determining where the installers were going, providing accommodations if needed, handling all payroll, and communicating with the installers. She was considered to be a supervisor over the installers in the field. Ms. Rone was the direct point of communication with installers in the field "when they wanted to go or when you were scheduling them out for another job." (Trial Tr. 1-12-2010 P.117 L.4-8; P.118 L.1- P.119 L.13).

Ms. Rone testified that she is aware of the policies of Installers regarding use of company vehicles. She testified, "[t]he vehicles were not to be used for personal use - - there was absolutely no drinking, drugs, anything tolerated when out of town nor when in use of a vehicle." Ms. Rone stated that, as a general practice, employees of Installers were not allowed to take the

vehicles home. When an installer was in St. Louis, the company vehicle was to be parked "[a]t the Total Lock and Security parking lot." She testified that company vehicles were only supposed to be operated by the employee to whom the vehicle was assigned, and that vehicles could be assigned to a crew, depending on "whether they were approved through insurance or not." Ms. Rone stated that an employee was not assigned a vehicle if that employee was not going out of town. (Trial Tr. 1-12-2010 P.119 L.14-P.120 L.25).

With respect to whether the Bunches were aware of these policies, Ms. Rone testified that she had explained the alcohol policy to the Bunches in the presence of Ms. Fogerty. She stated that she was unaware of any instances in which the Bunches used a company vehicle for personal use in St. Louis. (Trial Tr. 1-12-2010 P.122 L.11-14; P.123 L.3-6). Ms. Rone testified that she was aware of at least a couple of occasions when the Bunches took a company vehicle home. She stated that she was not a part of the decision to allow the Bunches to take the Jeep Liberty home with them on November 21, 2007, when they returned to St. Louis after being on the road for seven or eight months. She explained that she had no authority to allow an installer to take a vehicle home. (Trial Tr. 1-12-2010 P.149 L.8-13; P.152 L.1-24) Ms. Rone testified that employees of Total Lock/Installers were allowed to use company vehicles for personal use while out of town, but if they took a vehicle home, they could not remove it from their driveway. (Trial Tr. 1-12-2010 P.153 L.18-24). Ms. Rone testified that the only time she was aware of when an employee of Installers would be permitted to take a company car home in St. Louis was when there was an extremely late arrival or an extremely early departure. She stated that when an employee took a company vehicle home for an early morning departure, no personal use was permitted. That, she said, was made very clear to Installers employees. (Trial Tr. 1-12-2010

P.176 L.19-25; P.177 L.5-14).  Ms. Rone no longer works for Total Lock/Installers and is a very believable witness.

Ms. Rone testified that she was involved in the hiring of Mr. Brandt, in that she interviewed him and discussed company policies regarding company vehicle use with him.  She testified that she explained to him that there was no personal use of vehicles and absolutely no drinking and driving.  She also explained the company policies regarding what was expected of installers on the road, including that there is no alcohol use after leaving St. Louis, even in hotel rooms.  She testified that she also talked to him about these company policies after he was hired, especially when he was reassigned to work with a different installer.  (Trial Tr. 1-12-2010 P.123 L.16-P.124 L.19).

Ms. Rone explained that before the accident, Mr. Brandt had requested time off work with Installers.  She received his request via facsimile transmission on October 19 or 20, 2007.  She then had a conversation with him and made immediate arrangements for him to come home as soon as possible.  Ms. Rone testified that she believed the last time Mr. Brandt worked for Installers was October 21 or 22, 2007.  After being shown a time sheet for Mr. Brandt, Ms. Rone concluded that the last time he did any work for Installers was October 26, 2007.  She testified that he was not scheduled for another job after that date, he never called to be put back on the schedule, nor did he ask if there was any more work for him.  (Trial Tr. 1-12-2010 P.124 L.25-P.127 L.6) (Plaintiffs' Exhibit 7-B) (Plaintiffs' Exhibit 7-A).  Ms. Rone testified that from the date he left his last job on October 26, 2007, Mr. Brandt had no permission from Installers to be operating any company vehicles.  (Trial Tr. 1-12-2010 P.128 L.8-13).

Ms. Rone testified that the Bunches sent her a facsimile transmission, requesting some time off. One of the reasons they requested this time off was so that they could tend to some matters related to their personal vehicle, specifically, getting the vehicle inspected, paying taxes on the vehicle, and licensing their vehicle. She testified that neither Mr. Bunch nor Mrs. Bunch ever told her that they had loaned or given their personal vehicle to their daughter.[11] She testified that she did not speak to either Mr. Bunch or Mrs. Bunch on November 23, 2007, as she did not work that day. Ms. Rone's first day back to work after Thanksgiving was Monday, November 26, 2007. (Trial Tr. 1-12-2010 P.128 L.19-P.129 L.3; P.129 L.20-25; P.130 L.3-13).

Ms. Rone testified that the Bunches were scheduled to leave on a trip for Installers on November 27, 2007. The trip has been called the Washington D.C. trip, but it was actually a hotel job in Alexandria, Virginia, outside of Washington D.C. The Bunches had been specially requested by the manufacturer for the job. Ms. Rone stated that the trip had been booked several weeks in advance and that she communicated with the Bunches before Thanksgiving to schedule them for the job. She stated that she did not schedule the Bunches for the job on Sunday, November 25, 2007, rather she had talked to them about the job at least two weeks earlier. Ms. Rone testified that she did talk to Mrs. Bunch on November 25, 2007, when Mrs. Bunch called Ms. Rone on her company cell phone while she was at home. According to Ms. Rone, they discussed, "[h]ow the holidays were, how Hope was doing. Just, you know, basic, you know,

---

[11]During cross-examination, Ms. Rone was shown the transcript of her deposition testimony, in which she was asked if she became aware that the Bunches' daughter had their personal vehicle and that was the only vehicle available to them to operate when they were back in St. Louis. She responded in the deposition that she was not made aware of that information from the Bunches, but that she was made aware of the information by Daniel Brandt sometime in September. She testified that she is sure she did not get that information from Mrs. Bunch. (Trial Tr. 1-12-2010 P.162 L.24-P.163 L.21).

how are you kind of conversation." She said there was no discussion regarding work during that call. Ms. Rone also testified that she did not talk to either Mr. Bunch or Mrs. Bunch on November 26, 2007; that Mr. Bunch never told her that he or they would be dropping-off food at his mother's house; that she had no knowledge of the trip to Mr. Bunch's mother's house; that neither Mr. Bunch nor Mrs. Bunch told her that Mr. Brandt would be driving the vehicle; and that she had no knowledge that Mr. Bunch or Mr. Brandt was going to be drinking that night. (Trial Tr. 1-12-2010 P.130 L.18-P.131 L.13; P.132 L.2-24; P.133 L.4-P.135 L.1). On cross-examination, Ms. Rone was shown her deposition testimony, in which she stated that she did not talk to Mrs. Bunch on Sunday, but she did talk to her on Monday. Ms. Rone stated that she remembered giving those answers and that she was being truthful. (Trial Tr. 1-12-2010 P.164 L.11-P.165 L.3).

Ms. Rone testified that she did not speak with Mr. Brandt on November 26, 2007, and that the last time she talked to him before the accident was the Monday before the Thanksgiving holiday, when he inquired when the Bunches would be coming home. She first learned of the accident when she arrived at work on Tuesday morning, November 27, 2007. Within a few days after the accident, she went with Ms. Fogerty and Mr. McGeehan to Weber Chevrolet at Olive and I-270, to view the wrecked Jeep Liberty. Ms. Rone testified that she looked inside the vehicle and saw tools, a red cooler, paperwork, and beer cans. She said that there were two full beers in the cooler, and three or four empty beer cans outside of the cooler in the car, one in the back seat, and she could not recall "about the others." (Trial Tr. 1-12-2010 P.135 L.5-P.136 L.18).

Defendants' Exhibit B was the subject of a pre-trial filing and arguments on the record. It was discovered by Defendants in papers at the Festus Police Department, as it was not disclosed by Plaintiffs under Rule 26. After the document was discovered and counsel for Plaintiffs was asked why the relevant document had not been disclosed, a search was made of the records at Installers and Total Lock and no original or copy of the document was located. Ms. Rone testified that she was familiar with the document, and that, to the best of her knowledge, she had prepared it. The document, dated December 3, 2007, was sent by facsimile transmission on December 6, 2007, from Ms. Rone's facsimile machine to the Festus, Missouri Police Department. It was sent for the purpose of obtaining the release of the wrecked Jeep Liberty, so that it could be towed to a location closer to the office. Ms. Rone testified that she believes the document was sent with the authority of Ms. Fogerty. The message stated that Daniel Brandt is an employee of Total Lock/Installers Company. (Trial Tr. 1-12-2010 P.140 L.19-P.141 L.23; P.142 L.8-20).

### H.    TESTIMONY OF JOHN DENNIS MCGEEHAN

Mr. McGeehan is the brother of Ms. Fogerty, and has been employed at Total Lock for about six years. He was formerly employed by Installers for six or seven years. As Shop Manager for Total Lock, he takes care of maintaining company vehicles. Additionally, since Eve Rone is no longer employed by either company, Mr. McGeehan "hands [vehicle] keys out" to employees, a task Ms. Rone used to perform. (Trial Tr. 1-12-2010 P.183 L.5-P.184 L.13).

Mr. McGeehan testified that he is familiar with the Installers policy regarding use of company vehicles. He said that in 2006-2007, when new employees were hired, Ms. Fogerty would explain to them that there was to be no drinking and driving, no alcohol, and no drugs on

the property. Additionally, there was to be no personal use of company vehicles in St. Louis, unless authorized by Ms. Fogerty. Mr. McGeehan explained that, upon returning to St. Louis, the company vehicle was to be dropped off so that he could take care of vehicle maintenance. The vehicle then remained at Total Lock until it was assigned out again. (Trial Tr. 1-12-2010 P.184 L.14-P.185 L.22). He said if someone came back to town from a job at 1:00 in the morning, and they were driving by their house before they would drive to the shop, they could bring the vehicle in the next day. (Trial Tr. 1-12-2010 P.204 L.16-P.205 L.2).

Mr. McGeehan testified that only those individuals to whom a vehicle was assigned could drive that company vehicle. He explained that "sometimes we had groups of one or we had groups of two providing they had a driver's license and were insurable, they were, that's the truck that they were allowed to drive, yes." He testified that this had been explained to the Bunches, and that they understood the Installers policy regarding vehicle use. (Trial Tr. 1-12-2010 P.185 L.23-P.187 L.3). Mr. McGeehan said that he also explained the same policies to Mr. Brandt, who said that he understood. (Trial Tr. 1-12-2010 P.187 L.9-21).

Mr. McGeehan testified that he believed that the last time Mr. Brandt worked for Installers was "October, before Thanksgiving, so it was like at the end of October or beginning of November of 2007." Mr. McGeehan testified that before the accident, Mr. Brandt "came back and decided - - he said it wasn't for him, that he didn't want to go do it anymore." (Trial Tr. 1-12-2010 P.187 L.22-P.188 L.10). Mr. McGeehan said that Mr. Brandt told him this when Mr. Brandt got back from his last trip, either from Kansas or Chicago. (Trial Tr. 1-12-2010 P.191 L.22-P.192 L.4).

Mr. McGeehan testified that he met with the Bunches on November 23, 2007, when they "came in or, you know, on that Friday they came in and they were supposed to be dropping the truck off, of course." He said that they did not have a ride home because Mr. Brandt had taken his car home and there were no plates on their car, so they asked permission to take the company vehicle home. Mr. McGeehan testified that he told the Bunches that it was necessary to leave the Jeep Liberty with him so he could get it maintained, because it had been out so long. He said that the Bunches agreed that they would take the vehicle for maintenance on their way home, where it would be parked until they were able "to go out again." He said that Ms. Fogerty told them that they were to drive it to their house and park it. He testified that Mr. and Mrs. Bunch agreed to leave it parked. (Trial Tr. 1-12-2010 P.188 L.11-P.191 L.5).

On cross-examination, Mr. McGeehan testified that when the Bunches came to the office on November 23, 2007, they initially met in Eve Rone's office, as she was not in that day. They then moved their conversation into Ms. Fogerty's office, where the Bunches started talking about needing to take the Jeep Liberty home with them. Mr. McGeehan stated that "we explained to them that they needed to drive it home, park it, and then they could get their plates on their car and take care of what they needed to before they left." He agreed that allowing the Bunches to take the company vehicle home was "different than the normal course of business." He explained, "I know they didn't have any transportation and he was, he told me he was getting plates on his car. That was what helped kind of make the decision." (Trial Tr. 1-12-2010 P.198 L.5-13;P.199 L.1-17).

Mr. McGeehan testified that he would not have expected the Bunches to use the company vehicle to prepare for their next business trip out of town, rather he expected that they would use

their personal car after they got the license plates. He said that if they needed to get something for the job they were about to go on, it would not have been permissible to use the Jeep Liberty. He explained that this would have violated the rule he and Ms. Fogerty gave them on Friday, which was "to park the car, get their plates, and they take care of their business with their car." (Trial Tr. 1-12-2010 P.205 L.13-P.206 L.3). In Mr. McGeehan's deposition testimony, he had testified that it would have been okay for the Bunches to use the company vehicle to replenish their own tools for the next job because "that's just the same thing as being out of town and having to go get something." (Trial Tr. 1-12-2010 P.206 L.25-P.207 L.7).

Mr. McGeehan testified that he went to Weber Chevrolet, where the Jeep Liberty had been towed, and observed two or three open beer cans in the interior of that vehicle and a couple of unopened beer cans in the cooler inside the vehicle. (Trial Tr. 1-12-2010 P.191 L.6-17).

## I.      TESTIMONY OF HAROLD MERX

Plaintiffs objected to Mr. Merx's testimony, arguing that they were unable to complete discovery regarding impeachment and credibility issues early in this case because Mr. Merx relied on his rights under the Fifth Amendment when an effort was made to depose him. The Court determined that it would allow Mr. Merx to testify in this court-tried case, and reserve ruling on whether it would consider any of his evidence, being mindful of the possible prejudice to Plaintiffs. (Trial Tr. 1-12-2010 P.216 L.4-P.217 L.22).

Mr. Merx was employed by Installers in the early 1990s, and worked there for about a year and a half. He was hired again about a year later, and worked there until about 2002 or later, when he went to work for Total Lock. Mr. Merx testified that he was an installer of security access controls, and when he started working for Total Lock, he also did a lot of the training for

future hires. (Trial Tr. 1-12-2010 P.218 L.17-P.219 L.9). He said that he was mainly a service technician, although he carried "a bunch of other little titles here and there that really amounted to nothing." He also explained, "I was training on the installation of the work, what the dos and don'ts. And probably a little bit of, you know, now I don't want to say company policy but, you know, I was a little bit of management so, you know, there was some, you know, things that, you know, the dos and don'ts to protect the liability of the company." (Trial Tr. 1-12-2010 P.221 L.10-25).

Mr. Merx testified that, through his employment with Total Lock/Installers, he traveled across the country in a company vehicle, and at times, he would fly. He said that he was a crew leader for the last ten years of his employment, explaining that a person was a crew leader if he or she was the leader of a job or if he or she was alone on the job, regardless of title. (Trial Tr. 1-12-2010 P.222 L.18-25). He testified that vehicles were assigned to whomever "they gave the key to, usually. I mean, if somebody needed a vehicle on the road, I - - from my understanding, everybody was actually able to use the vehicle. But whoever it stayed with, they was really responsible for it and that's who it was assigned to." (Trial Tr. 1-12-2010 P.225 L.5-22). When asked who was authorized to drive company vehicles before November 26, 2007, Mr. Merx said, "[a]re you talking about on a job site or are you talking about in St. Louis? I mean, again, if you had a legit driver's license and you was employed, you was, you should, you could have been able to drive that vehicle. It just, it was just a timing of where you was at and what was the situation." (Trial Tr. 1-12-2010 P.227 L.16-23).

Mr. Merx testified that when he first started working, having an assigned company vehicle was an employment perk. (Trial Tr. 1-12-2010 P.226 L.4-10). He said that prior to the accident

on November 26, 2007, no one told him that company vehicles could not be used for personal use in St. Louis. He also said that he used company vehicles for his personal use prior to the accident. (Trial Tr. 1-12-2010 P.230 L.17-25). He testified that he had no personal vehicle because he had a company vehicle. (Trial Tr. 1-12-2010 P.231 L.8-12). At trial, Mr. Merx testified that there was an employee of Installers who lived near him, and that he saw the employee using a company vehicle for personal use. This contradicted his prior deposition testimony in which he stated, "[n]o, I can't say, you know. I didn't see, you know, visually see anybody? How could I answer that?" (Trial Tr. 1-22-2010 P.253 L.16-25). He agreed that the only time an employee could allow someone else to drive a company vehicle was when the other person was another employee who needed the vehicle for a business reason. Mr. Merx was then asked, "[y]ou couldn't drive any company vehicles, you couldn't let someone else drive a company vehicle for a personal reason, right? He responded, "[n]ot without permission." (Trial Tr. 1-12-2010 P.254 L.21-24).

Mr. Merx also testified that it was "pretty common knowledge that nobody could drink and drive." (Trial Tr. 1-12-2010 P.229 L.1-7). However, he testified that he saw John McGeehan and Joshua McGeehan drinking at a concert in Madison, Wisconsin. When the concert was over, John McGeehan drove a company vehicle to Wisconsin Dells, on company business. (Trial Tr. 1-12-2010 P.231 L.22-P.232 L.25). Mr. Merx testified that "[o]ne of the guidelines that Gidget tried to put across is that there was no alcohol at all. Now that would be not just be in the vehicle but that would be on the job site or that would be in their hotel. So there was - - it was a no alcohol policy. That was almost one of the requirements of even having the job." (Trial Tr. 1-12-2010 P.250 L.5-19). He agreed that if someone got behind the wheel of a company vehicle after drinking alcohol, they would not have permission to drive, nor could some

47

other person drive "if you knew they were drinking." He knew the company would not allow that. (Trial Tr. 1-12-2010 P.250 L.24-P.251 L.8).

On cross-examination Mr. Merx was asked if he had "an axe to grind"with Ms. Fogerty, Total Lock and Installers. He answered "[n]o." When asked if he had been terminated by Total Lock/Installers for stealing, he answered, "Fifth Amendment." He gave the same answer when asked if he was terminated for selling gasoline on the company card, and when he was asked, "isn't it true that you were going down here on Bates Avenue and taking the company car, company gas card and selling gas to people at fifty cents on the dollar?" He also cited the Fifth Amendment in refusing to answer whether he stole and sold company tools, and whether he was criminally prosecuted for stealing gas and tools from the company. He denied that he had been drug tested, and that he tested positive for crack cocaine. (Trial Tr. 1-12-2010 P.233 L.14-P.236 L.19). Mr. Merx did admit that after he was terminated, he made a claim for unemployment, and Total Lock prevailed on its appeal of the award of unemployment benefits, thereby resulting in the ultimate denial of benefits. (Trial Tr. 1-12-2010 P.241 L.11-24). Mr. Merx also filed a grievance with the carpenters' union for unpaid overtime, but that grievance was denied. He testified that he believes that Total Lock owes him $80,000.00. (Trial Tr. 1-12-2010 P.242 L.2-P.243 L.2).

While the Court could strike Mr. Merx's testimony in its entirety because of his refusal to answer questions, that invitation by Plaintiffs will be declined. A strong foundation establishing bias on the part of Mr. Merx against Total Lock/Installers exists. Curiously, his testimony supports Plaintiffs on many issues. Overall, little weight is ascribed to his testimony.

## J.    TESTIMONY OF DONALD A. BUNCH

Mr. Bunch is the sixty-six year old husband of Patricia Bunch, whom he married on October 24, 1986.  He has two years of college, and was honorably discharged from the United States Armed Services as a Staff Sergeant, serving from 1963 to 1974 or 1975.  He was a St. Louis police officer for thirty years, and then worked in security for the MetroLink system.  He retired from that job and later began working for Wal-Mart, followed by another retirement.  He and his wife then went to work for Total Lock/Installers.  (Trial Tr. 1-13-2010 P.4 L.11-P.6 L.11).  Mr. Bunch described how Mr. Brandt came to live in his house.  He testified that Mr. Brandt's mother died, and Mr. Brandt and the Bunches' daughter became close friends.  He described Mr. Brandt as being a "good man," and stated, "we asked him if he wanted to stay with us and he'd help out around the house."  Mr. Brandt continues to live in the Bunch home.  (Trial Tr. 1-13-2010 P.6 L.12-P.7 L.5).

Mr. Bunch testified that he began working for Total Lock/Installers in April or May of 2006.  At that time, the Bunches owned a 1997 Nissan Maxima.  In early 2007, they gave that vehicle to their daughter to use, on the condition that she keep it insured.  They did not get the car back from their daughter until December of 2007, after the accident.  (Trial Tr. 1-13-2010 P.7 L.6-P.8 L.8).  Mr. Bunch testified that he called Ms. Fogerty from the road and told her that they had no vehicle to use and she said, "no problem, you can use the vehicle."  He said that John McGeehan "knew the same circumstances," but did not believe that Eve Rone had that information, unless someone else told her.  (Trial Tr. 1-13-2010 P.9 L.12-P.10 L.7).

Mr. Bunch stated that he received a DWI on June 17, 2005, and his license was reinstated ninety days after his arrest.  (Trial Tr. 1-13-2010 P.10 L.16-P.11 L.6).  He testified that he was

49

not asked to supply information about his DWI when he completed the job application or during the interview. He said it never came up in his initial interview, but the subject arose in 2007, when they were called into the office because the insurance company had reviewed records and discovered the 2005 DWI. Mr. Bunch was told that he could "no longer drive the car anymore." (Trial Tr. 1-13-2010 P.15 L.23-P.16 L.22).

Mr. Bunch testified that he was hired by Ms. Fogerty to install key card locks in motels, hotels, and schools. (Trial Tr. 1-13-2010 P.11 L.7-17). The Bunches were originally trained by John McGeehan on a job in Louisiana. When they first started going out on jobs "on their own," a couple of months after they were hired, they were assigned a Ford Ranger by Ms. Fogerty. (Trial Tr. 1-13-2010 P.13 L.1-P.14 L.1). Mr. Bunch testified that he was not given any explanation about what he could or could not use the company vehicle for. He said that there were no restrictions placed on the use of the vehicle and that they "had full use of the vehicle for any reason whatsoever." He testified that Ms. Fogerty told them that when they were out of town on a job, they should "use that car to do things on your off time, go to eat, go to the store, go travel, whenever your down time is to go sightseeing. We had full use of that vehicle." Mr. Bunch testified that when they were back in St. Louis, "as long as I had my own car, it was understanding that we use your own car. But the minute she found out we no longer had a car, we were permitted to use that vehicle for our own personal use. And that was from her." He testified that she learned the Bunches had no car in 2007. (Trial Tr. 1-13-2010 P.14 L.23-P.15 L.22).

Mr. Bunch testified that a couple of months after beginning employment, they brought the Ford Ranger to their home in St. Louis between jobs, with "permission" from Ms. Fogerty or Mr.

McGeehan. He stated, "[t]he times that we brought the vehicle home with us, it was like a two-day period and we were out on the road right away. So they said rather than go and bringing it back out, keep the vehicle with you and then head on out on your next assignment." He said that when they took the vehicle home, they were not told of any restrictions on the use of the vehicle. (Trial Tr. 1-13-2010 P.16 L.23-P.17 L.17). The standard practice was that when they were on their way home from a job, they would report in that the job was complete, and then they would take the vehicle to their house. He said that no one at Total Lock/Installers ever told them to take the vehicle to the office, not to take the vehicle home, or not to use the vehicle while at home. (Trial Tr. 1-13-2010 P.18 L.5-23). Mr. Bunch testified that Ms. Fogerty expressly told him that he could use the vehicle while in St. Louis. He also testified that he took care of most of the maintenance, both for the Ford Ranger and for the Jeep Liberty. (Trial Tr. 1-13-2010 P.23 L.10-24).

The Bunches were away from home most of the time during their employment with Installers.[12] Mr. Bunch testified that when they received their work assignments, initially from Ms. Fogerty and later from Eve Rone, they were on the road "nine times out of ten." Mr. Bunch stated that when they were at home and received a work assignment call, Ms. Fogerty "was aware that [we] were at home" and was aware that they still had the Ford Ranger. He testified that at no time did anyone in a supervisory capacity at Installers ever tell them that he and his wife could not use a vehicle assigned to them for personal use, and that Ms. Fogerty had actually told them

---

[12]There is no evidence that they ever worked for Total Lock. There are many references in this opinion to Total Lock, but only because various witnesses included both companies in their answers. The only relevant evidence is that the Jeep Liberty was titled in the ownership of Total Lock, but there is no evidence that the Bunches ever worked for that company, and all of the evidence supports the conclusion that they worked for Installers.

that they could do so. (Trial Tr. 1-13-2010 P.19 L.11-P.20 L.18). He also testified that no one in a supervisory capacity ever instructed him about allowing another employee to use a company vehicle while on the road or in St. Louis, but he did know that anybody who worked for Total Lock/Installers and who was covered by the insurance policy "drove any vehicle that was on the lot." (Trial Tr. 1-13-2010 P.21 L.3-21).

Mr. Bunch testified that, based on his experience as a law enforcement officer, he did not believe that he had authority to operate a company vehicle under the influence of alcohol. However, he stated that no one at Total Lock/Installers ever talked to him about drinking and driving. (Trial Tr. 1-13-2010 P.22 L.4-20). Mr. Bunch was asked if he had ever been told "that you could not get into a vehicle and turn the key if you had had any drinking of alcohol at all." He answered, "[t]hat was never brought up." He testified that he knew nothing about a zero-tolerance rule within the company with regard to drinking and driving, stating, "I had no knowledge of any policy and nobody ever said anything to me about that." (Trial Tr. 1-13-2010 P.56 L.13-P.57 L.7). This testimony is inconsistent with the testimony of every other witness who testified in this case, with the exception of Officer Houston and expert witness Dr. Christopher Long, neither of whom would have knowledge of company policies. All other witnesses were very specific about being advised of the no drinking and driving rule. This testimony is also contradicted by the prior testimony of Mrs. Bunch, who was asked, "[y]ou would agree that Mr. Bunch knew this policy that if Mr. Bunch saw Mr. Brandt consuming alcohol, he knew that Mr. Brandt should not have been driving; right?" She answered, "correct." (Trial Tr. 1-12-2010 P.62 L.13-17). The Court finds that Mr. Bunch is not truthful and the Court does not believe his testimony, both generally and on this issue specifically.

According to Mr. Bunch, the last job of the Bunches before coming home for Thanksgiving in 2007 was in Lincoln, Nebraska. They had been on that job for seven and one-half months, during which time the Jeep Liberty was continuously assigned to them. Mr. Bunch stated that Mrs. Bunch sent a facsimile transmission to the Installers office, requesting some time off. They returned home on November 21, 2007, the day before Thanksgiving. While they were on their way home, Mr. Bunch called Eve Rone to let her know that they were returning to St. Louis. Mr. Bunch testified that Ms. Rone did not tell him to take the Jeep Liberty to the office, and neither he nor his wife told Ms. Rone anything about taking the vehicle to their home. He also testified that no one told them that they could not use the Jeep Liberty while they had it at their house, or that they needed to return the vehicle to the shop. (Trial Tr. 1-13-2010 P.27 L.8-P.30 L.1).

Mr. Bunch testified that on Friday, November 23, 2007, he wanted to go to the office to replenish supplies and return broken locks from previous jobs. He called the office to see if anyone would be there that day, and Mr. McGeehan said he was there. So, Mr. and Mrs. Bunch drove to the office, where they met with Ms. Fogerty and Mr. McGeehan. Mr. Bunch said that he talked to Ms. Fogerty first, explaining that he had locks from four or five previous jobs. He then talked to Mr. McGeehan, who told Mr. Bunch that they needed to stock up on supplies since they had been out for seven months, and that he wanted to take the Jeep Liberty to Jiffy Lube for maintenance that was overdue. Mr. Bunch testified that he told Mr. McGeehan, "fine, but somebody's going to have to run us home." Then, Ms. Fogerty and Mr. McGeehan talked and said, "won't you just take the Jeep with you and get it serviced by your house," to which Mr. Bunch replied, "fine . . . , that's what I think I'll do." Mr. Bunch said that while they were at the

office, no one said anything about not driving the vehicle after they got home, nor did anyone tell them that they had to leave the vehicle parked in their driveway. He said that no one discussed personal use of the vehicle; nothing was discussed about allowing other employees to drive the vehicle; and nothing was mentioned about alcohol use. Mr. Bunch testified that, before they departed, Ms. Fogerty and Mrs. Bunch talked about catering for a Christmas party, and he replenished their supplies. After leaving, the Bunches stopped at a Jiffy Lube business near their house, obtained approval for the service estimate from Mr. McGeehan, and had the necessary maintenance done before going home. (Trial Tr. 1-13-2010 P.30 L.12-P.33 L.11).

On cross-examination, Mr. Bunch was asked if the reason they drove to the Installers office on Friday, November 23, 2007, was because John McGeehan had asked them to return the Jeep Liberty to the office, and he answered "[n]o, sir." Mr. Bunch was then asked if in his deposition he said he went to the office because Mr. McGeehan asked that the car be brought back. Mr. Bunch responded, "[i]f I told you that, that was not correct. I went there because I knew I had to go there to take locks back and to restock our supplies. The conversation about having anything else done to that Jeep wasn't done until we were there." (Trial Tr. 1-13-2010 P.50 L.24-P.51 L.22). Mr. Bunch was also asked why they didn't get their car licensed on that Friday instead of going in to the office, since they believed that they would not be going out on another job for a week or so. He responded that he was following protocol because Ms. Fogerty wanted all broken locks brought back to her office whenever an installer was in town. He testified that he talked to Ms. Fogerty on the telephone on Friday, and she said, "I need those stuff now." Mr. Bunch was then asked to clarify whether he talked to Ms. Fogerty or Mr. McGeehan when he called on Friday morning, and Mr. Bunch responded, "I did not talk to John.

I talked to Gidget." Upon being asked if he said in his deposition that he talked to Mr. McGeehan on the phone that Friday, Mr. Bunch stated, ""[i]f I did, I was mistaken." The deposition testimony states, "John had called me out there." (Trial Tr. 1-13-2010 P.51 L.23-P.54 L.10).

It is undisputed, and Mr. Bunch admitted under oath, that there is a receipt for a purchase of gasoline at a Phillips 66 Station in Creve Coeur, Missouri on November 23, 2007, which shows Mr. Bunch's company identification number. The purchase was made shortly after the Bunches left the Total Lock/Installers office. However, Mr. Bunch vociferously denies purchasing gas that day. When asked at trial if he went to get gas after leaving the office, he curiously responded, "[n]o sir. I did not get gas in that car. I know you got a receipt showing that with my ID number on there. But there's a half dozen people in that company that knows my ID number. I, or my wife, did not gas that car up there in Creve Coeur like you said. I don't care, you can show me that receipt all you want. . . . I did not sign it and I did not get gas." (Trial Tr. 1-13-2010 P.83 L.6-15). Mr. Bunch further claimed that he did not even know the location of the Phillips 66 station in Creve Coeur. However, he admitted that the odometer reading of the vehicle at the Phillips 66 station was 140,636 miles, and that the odometer reading of the Jeep Liberty at the Jiffy Lube on Jeffco Boulevard near the Bunches' home was 140,662, a difference of 26 miles. Mr. Bunch agreed that it is approximately 26 miles from Creve Coeur to Jeffco Boulevard in Arnold. (Trial Tr. 1-13-2010 P.85 L.8-P.86 L.13).

Mr. Bunch seems to fashion testimony to suit his purposes, irrespective of compelling contradictory evidence. The Court believes that Mr. Bunch was being untruthful when he testified that neither he nor his wife filled the Jeep Liberty in Creve Coeur, Missouri, on November 23, 2007.

Mr. Bunch testified that he and Mrs. Bunch got their next work assignment on the Sunday morning after Thanksgiving, stating that his wife told him that "Eve had called and told her that we were requested back to Alexandria, Washington D.C. to do the job." He said that he was not happy with the idea of leaving for the job because he wanted to remain home, but Mrs. Bunch told Ms. Rone that they would go, against her husband's wishes. He explained, "it's like a pat on your back if you get called back on a job like that." Mr. Bunch denied that the assignment was made on Friday when they were at the shop, and he denied that the assignment was made before they returned home for Thanksgiving. (Trial Tr. 1-13-2010 P.34 L.23-P.35 L.20). Mr. Bunch testified that they did not go to the office on Friday to get the Jeep ready to go to Washington D.C. the following week. He could not explain how Mr. Brandt knew that they were being reassigned back to Washington. (Trial Tr. 1-13-2010 P.55 L.3-19). This testimony is not persuasive. If the Bunches did not know that they were being assigned to a job in Washington D.C., they would have believed that they had several days to return to the office. Instead, they came to the office on the Friday after Thanksgiving, even though they had guests at their house. The Court is persuaded that the Bunches had been assigned to go to Washington before they returned for Thanksgiving, and that Mr. Bunch had been instructed to return the Jeep Liberty to Installers on November 23, 2007.

Mr. Bunch testified that Ms. Rone called back on Monday, requesting that the Bunches leave for the job that day, but Mr. Bunch told her, "[n]o way. . . . we'll go Tuesday." Ms. Rone then called back again on Monday, and Mr. Bunch told her, "listen, we've been gone for over seven months. We asked to come home to take care of some personal business. I haven't seen my mother in seven or eight months, and I'm going to take her some food left over from

Thanksgiving. After we do that, we will leave Tuesday morning." Mr. Bunch testified that Ms. Rone said, "fine, take the food to your mother's but make sure you are on the road Tuesday morning." Mr. Bunch stated that at no point did he talk with Ms. Rone about using the Jeep Liberty to take food to his mother's house; he merely stated that Ms. Rone approved of him taking the food to his mother, without further details about how Mr. Bunch would get there. He did testify that, at that time, Ms. Rone knew that he did not have a personal vehicle. (Trial Tr. 1-13-2010 P.35 L.21-P.36 L.20).

Mr. Bunch testified that, after his second conversation with Ms. Rone on Monday, he and Mr. Brandt took the food to his mother's house. He said that Mr. Brandt drove him to his mother's house because his wife had too much to do with getting ready for the trip. He explained, "apparently, she gave, she gave Dan the keys and told him to take me out to mom's. Because she knew I wasn't allowed to drive the car." Mr. Bunch said that he and Mr. Brandt visited with Mr. Bunch's mother for forty-five minutes to an hour. They left because Mr. Bunch needed to get back to help his wife load the car. On the way home, he suggested that they stop to "top off the gas tank so all we have to do in the morning is hit the road." He admitted that he did not tell Ms. Rone that Mr. Brandt was going to drive him to his mother's house. (Trial Tr. 1-13-2010 P. P.36 L.25-P.38 L.5).

Mr. Bunch testified that he did not have any alcohol to drink before he and Mr. Brandt left for his mother's house. Mr. Bunch also testified that he was not aware of whether Mr. Brandt had consumed any alcoholic beverages before they left to go to his mother's house. (Trial Tr. 1-13-2010 P.38 L.10-16). Mr. Bunch testified that when they picked Mr. Brandt up at the hotel, he did not see Mr. Brandt bring a large cooler or a 30-pack of beer out of the hotel. Mr. Bunch also

testified that he did not see Mr. Brandt take thirty cans of beer from the Jeep Liberty and put them in the refrigerator in the garage. He said he did not drink any of those beers with Mr. Brandt on that Sunday, nor did he drink any of those beers the next day. (Trial Tr. 1-13-2010 P.61 L.6-12; P.62 L.2-24).

Mr. Bunch stated that Mr. Brandt was upstairs in his room for most of the day, and then clarified, "[h]e came down I guess, I had never seen him, but I guess he came down because he has to come down to get food." (Trial Tr. 1-13-2010 P.38 L.16-24). Mr. Bunch agreed that in order to get to the garage to get beer, Mr. Brandt would have had to go through the house. Mr. Bunch also agreed that he testified on direct examination that he did not see Mr. Brandt all day on Monday until they left to deliver the food. He stated that he spent most of Monday on the computer in the basement, but he did come upstairs for lunch around 11:00 a.m. Mr. Bunch testified that he did not see Mr. Brandt at lunch, and then he went back downstairs until about 3:00 p.m., at which time he went to the living room to watch television. Later, he loaded all of the tools in the car, and then loaded up the food to take to his mother's house. He testified, "[a]fter I loaded up the car, next thing I know Dan's got the keys and he said, I'm driving you to your mom's." (Trial Tr. 1-13-2010 P.62 L.25-P.65 L.3). Mr. Bunch testified that his mother lived twenty-six miles from his house. (Trial Tr. 1-13-2010 P.66 L.2-3).

Mr. Bunch again testified that he had no knowledge that Mr. Brandt drank any alcohol before leaving for his mother's. Mr. Bunch also testified that, while they were at his mother's house, he and Mr. Brandt each drank one beer and opened a second, but neither finished his second beer. (Trial Tr. 1-13-2010 P.39 L.3-25). This is in direct contrast to Mr. Brandt's

admission that he drank two beers at Mr. Bunch's mother's house. The Court does not find Mr. Bunch's testimony to be credible.

Mr. Bunch testified that he believed that Mr. Brandt was okay to drive and that he was not intoxicated when they left his mother's house. He stated that before they left, Mr. Brandt was not slurring his speech, he was not stumbling or exhibiting a lack of coordination, and his eyes were not glassy or watery. (Trial Tr. 1-13-2010 P.40 L.1-18). Mr. Bunch later testified that when Mr. Brandt got up from the table at Mr. Bunch's mother's house, he seemed perfectly normal, there was no strong smell of alcohol, his eyes were fine, his walking was fine, and his speech was not slurred. Mr. Bunch agreed that these were all characteristics of intoxication that he, as a former police officer, would recognize. He also confirmed that he did not notice these characteristics in the twenty minutes he spent with Mr. Bunch before getting into the car with him. (Trial Tr. 1-13-2010 P.72 L.3-P.73 L.22). Mr. Bunch recognized that if Mr. Brandt was intoxicated, he would not have let Mr. Brandt drive him out to his mother's house. (Trial Tr. 1-13-2010 P.75 L.4-5).

On direct examination, Mr. Bunch stated that they had the cooler in the car in order to transport the food to his mother's house, but did not say anything about the beer that was found in the cooler or the empty beer cans found in the car after the accident. On cross examination, Mr. Bunch testified that he and Mr. Brandt took two cans of beer from his mother's house, and put them in the cooler in the car. He said that there were no empty beer cans inside the car. (Trial Tr. 1-13-2010 P.72 L.3-13).

Mr. Bunch testified that on their way home, they were going to stop to get gas at a Shell station at the intersection of Interstate Fifty-Five and Richardson Road. He said that the accident

occurred before they got the gas, and that the next thing he remembered after the accident was being in the hospital. (Trial Tr. 1-13-2010 P.41 L.5-19). Mr. Bunch could not remember when they left his mother's house, but he remembered that it was dark. The accident happened at 7:35 p.m., and, according to Mr. Bunch, it occurred about ten or fifteen minutes after they left his mother's house. (Trial Tr. 1-13-2010 P.71 L.14-P.72 L.2).

Mr. Bunch admitted that taking food to his mother's was a personal use of the vehicle, but he claimed that he had permission to do so because Ms. Fogerty gave them "permission for full use of that vehicle for all personal reasons." (Trial Tr. 1-13-2010 P.41 L.20-P.42 L.5). Mr. Bunch testified that this was the first time that he and Mrs. Bunch had used the company vehicle for personal use, explaining "[t]hat's because we had no vehicle." He then confirmed that his family had never used a company vehicle for personal use prior to Thanksgiving weekend in 2007. (Trial Tr. 1-13-2010 P.58 L.13-21).

Mr. Bunch appeared in the courtroom for this court-tried case in a wheelchair. He suffered paralysis in the automobile accident on November 26, 2007. He served his Country honorably in the Armed Services, and was a public servant as a police officer for thirty years. He comes here with earned respect. However, the role of the Court is to seek the truth, to judge the issues based on the truthful evidence as it is presented, and to enter judgment under the law in accordance with credible evidence. In this case, under that standard, resolution of the remaining issues is straight-forward and not complicated. Neither Mr. Bunch, Mrs. Bunch nor Mr. Brandt seemed constrained by their oath; they appeared willing to say anything to advance the Bunches' claims. It is the Court's clear conclusion that all gave substantial untruthful testimony as to genuine material facts in the case.

### K.     SUMMARY OF FINDINGS OF FACT

The Court summarizes its findings of fact in the subsequent paragraphs.  Although Total Lock/Installers did not have written policies at the time in question, they did have established company policies that were communicated orally to all employees.  When Mr. Bunch and Mrs. Bunch were hired by Installers, they were told, and they understood, that vehicles owned by Installers were not for personal use, except when out of town on a job assignment, when they were encouraged to use their assigned vehicle for sight-seeing and other lawful personal uses. The extent of personal use allowed in St. Louis was limited to driving home upon returning from an out of town job late at night, after the Total Lock/Installers office was closed, and then back to the office on the next business day.  There were also a few instances in which an employee was permitted to use a company vehicle for a personal matter, upon obtaining express permission from Ms. Fogerty.  Otherwise, employees were to immediately return company vehicles to the Total Lock/Installers office upon returning to the St. Louis area.  If an employee took a company vehicle home with him or her, the company vehicle was to remain parked at the employee's house, until it was returned to the Total Lock/Installers office, or the employee left for another job.

Another policy that was clearly communicated to employees was that only those crew members who were assigned to a particular company vehicle were permitted to drive that vehicle. No employee had the authority to ask another employee to operate a company vehicle without first getting permission from Total Lock/Installers.  Additionally, the Bunches were instructed during the hiring process that employees were not permitted to operate company vehicles after consuming alcohol or illegal drugs.  It was well-known in the company that drinking and driving

would not be tolerated. Total Lock/Installers never granted permission for an employee to drive a company vehicle when that employee had consumed or was consuming alcohol or illegal drugs. Furthermore, no employee had authority to allow another employee to operate a company vehicle if the employee granting permission knew that the other employee had been or was consuming alcohol or illegal drugs. The Bunches were aware of the company's zero tolerance stance on drinking and driving, and they knew not to grant permission to drive a company vehicle to another person if that person had consumed or was consuming alcohol or drugs. Mr. Brandt was also aware of the company's zero tolerance stance on drinking and driving, and he knew that he should not drive a company vehicle after consuming any amount of alcohol.

The Court finds that the Bunches went to the Total Lock/Installers office on Friday, November 23, 2007, upon the request of Mr. McGeehan, to have the Jeep Liberty serviced in anticipation of their upcoming trip to Washington D.C. Mr. McGeehan and Ms. Fogerty did not know that the Bunches did not have a personal vehicle to use at that time. Because they did not have transportation home, Ms. Fogerty offered to let the Bunches take the Jeep Liberty to Jiffy Lube to have it serviced, and take it to the gas station to get gasoline for the impending trip. They were instructed to then take the vehicle to their house. Ms. Fogerty told them that the Jeep Liberty was to remain parked at the Bunches' residence for the remainder of the holiday weekend, until they left for Washington D.C. The Bunches agreed to these terms.

The Court further finds that Mr. Brandt consumed at least fifteen cans of beer on November 26, 2007, and that he was not honest about his consumption with the police, or with the Court at trial. When Mrs. Bunch gave Mr. Brandt the keys to drive the Jeep Liberty to Mr. Bunch's mother's house, she was aware that Mr. Brandt had been drinking. Additionally, Mr.

Bunch was fully aware that Mr. Brandt had been drinking before they started on the trip to deliver food, and Mr. Bunch remained aware of Mr. Brandt's alcohol consumption between the time that they left the Bunches' house and the time of the automobile accident. Mr. Bunch knew that Mr. Brandt was drinking alcohol just minutes before the accident on November 26, 2007.

Finally, the Court finds that the most persuasive evidence supports the conclusion that Mr. Brandt was an employee of Total Lock/Installers on November 26, 2007, but this does not mean he had authority to drive the Jeep Liberty. Employees were clearly only permitted to drive company vehicles when they were actually working or with specific permission, and Mr. Brandt had not been working for Total Lock/Installers on November 26, 2007, and had not been granted permission to operate the Jeep Liberty on that date. In fact, no one at Total Lock/Installers even knew that Mr. Brandt was driving the vehicle at the time. Moreover, neither Mr. Bunch nor Mrs. Bunch had authority to give Mr. Brandt permission to operate a Company vehicle, on November 26, 2007, or at any other time.

## II.   DISCUSSION AND CONCLUSIONS OF LAW

### A.   LIABILITY COVERAGE FOR DANIEL H. BRANDT, II

First, Plaintiffs seek a declaration from this Court regarding the liability coverage of Mr. Brandt, specifically requesting that the Court find that Mr. Brandt is not an insured under Plaintiffs' policies for the accident. Defendants filed counterclaims for declaratory judgment against Plaintiffs, requesting that the Court find that Mr. Brandt is an insured under Plaintiffs' policies. This Court previously determined that employees of Total Lock/Installers are not named insureds under the policies, and they are not covered by the insurance policies unless they have permission to use a company vehicle. Additionally, only officers of Total Lock/Installers have the

63

authority to give permission to an employee to use a company vehicle.  Mr. Brandt is not a named

insured under the policies, so in order for him to be covered by the subject insurance policies, he

must have received permission to operate the Jeep Liberty from an officer of Total

Lock/Installers, someone other than Mr. or Mrs. Bunch.

The issue of liability coverage for Mr. Brandt depends on the omnibus clause, "[a]

provision in an automobile-insurance policy that extends coverage to all drivers operating the

insured vehicle with the owner's permission."  Black's Law Dictionary 1116 (7th ed. 1999).  In

Missouri, motor vehicle liability insurance policies define an omnibus insured as one using the

insured vehicle with the permission of the insured.  *See* 30 Mo. Prac. Series, Insurance Law &

Practice § 9:12 (2009).  The Motor Vehicle Financial Responsibility Law mandates that an

owner's policy extend coverage to persons using an insured motor vehicle with the express or

implied permission of the insured.  Mo. Rev. Stat. § 303.190.2(2).  Missouri courts generally hold

that permissive use of a vehicle under an omnibus clause of an automobile insurance policy is a

question of fact, which may be satisfied by a showing of either express or implied permission.  *See*

*Shelter Mutual Ins. Co. v. See*, 46 S.W.3d 65, 67 (Mo. Ct. App. 2001); *State Farm Mut. Auto.*

*Ins. Co. v. Scheel*, 973 S.W.2d 560, 567 (Mo. Ct. App. 1998); *State Farm Fire & Cas. Co. v.*

*Ricks*, 902 S.W.2d 323, 324 (Mo. Ct. App. 1995).

### 1. Express Permission

"Permission is express if it is of an affirmative character, directly and distinctly stated,

clear and outspoken, and not merely implied or left to inference."  *Shelter Mut. Ins.*, 46 S.W.3d at

67.  "Whether permission be expressly granted or impliedly conferred, it must originate in the

language or conduct of the named insured or someone having authority to bind him in that respect." *Hanover Ins. Co. v. Abchal*, 375 S.W.2d 605, 609 (Mo. Ct. App. 1964).

In this case, it is clear that Mr. Brandt did not have express permission to operate the Jeep Liberty on November 26, 2007. No one from Total Lock/Installers gave permission to Mr. Brandt to drive the Jeep Liberty, nor did anyone at the company even know that he was driving the vehicle. Additionally, neither Mr. Bunch nor Mrs. Bunch had the authority or ability to grant permission to Mr. Brandt to use the Jeep Liberty, regardless of the purpose of the use. And, even if the Bunches had the authority to grant permission to Mr. Brandt to use the Jeep Liberty on their behalf, such authority would be negated in the present circumstances because the Bunches specifically agreed that they would leave the Jeep Liberty parked at their house over the holiday weekend and because they were not permitted to use the vehicle for personal reasons in St. Louis without the permission of Ms. Fogerty. Additionally, both Mr. and Mrs. Bunch were aware that Mr. Brandt had been drinking before he began operating the Jeep Liberty on November 26, 2007. Consistent with the Memorandum and Order issued in this case on December 22, 2009, the Court concludes that Mr. Brandt did not have express permission to operate the company vehicle.

### 2.    Implied Permission

"Implied permission is determined from the facts and circumstances of the case and usually arises from a course of conduct of the parties over a period of time." *Shelter Mut. Ins.*, 46 S.W.3d at 67. It "may be the result of a common practice or course of conduct whereby the owner acquiesces in the practice of another operating his automobile." *Id.* "[T]he permission contemplated by an omnibus clause is something more than mere sufferance or tolerance without taking steps to prevent, that term being used rather in the sense of leave, license or authority with

the power to prevent." *Allstate Ins. Co. v. Hartford Accident & Indem. Co.*, 486 S.W.2d 38, 45 (Mo. Ct. App. 1972). The burden to prove implied permission is on the party alleging implied permission. *See id.*

The Court finds that the circumstances in this case do not support Defendants' argument that Mr. Brandt had implied permission to operate the Jeep Liberty on November 26, 2007. The credible evidence does not establish a course of conduct in which Total Lock/Installers employees were allowed to interchangeably use any of the company's vehicles, or in which employees were granted broad and unfettered use of company vehicles while in St. Louis. To the contrary, it is clear that employees were clearly instructed that they were only permitted to use the company vehicle to which they were assigned on work assignments, that company vehicles were not for personal use in St. Louis, and that employees could not give permission to other employees or individuals to drive a company vehicle. It is also clear that these policies were followed and enforced, the rare exception occurring only when an employee obtained specific permission from Ms. Fogerty, the sole owner and president of Total Lock/Installers. Thus, the Court concludes that a course of conduct at Total Lock/Installers did not create implied permission for Mr. Brandt to operate the Jeep Liberty on November 26, 2007, to go on a personal errand for the Bunches.

Additionally, the Court finds that Mr. Brandt did not have implied permission to operate the Jeep Liberty as a "second permittee." The second permittee doctrine provides that

> when a third person is allowed to use an insured's car by permission granted by someone else to whom the insured gave permission to use the car, the third person's use of the car will be a permissive use, under the insured's automobile-liability-insurance policy, as long as that use falls within the scope of the permission originally given by the insured.

Black's Law Dictionary 1355 (7th ed. 1999). Missouri courts have established that a second

permittee is covered under the omnibus clause of an insurance policy in the following

circumstances:

> "1. The permission must come from the named insured, not simply from the first
> permittee.
>
> 2. Permission of the named insured to the second permittee may be implied as well
> as express.
>
> 3. Permission may be proven by circumstantial evidence, but the circumstances must
> be such that the necessary fact may be inferred therefrom and must reasonably follow,
> so that the conclusion so reached is not the result of guesswork, conjecture or
> speculation.
>
> 4. Permission from the named insured can be found or implied from a course conduct
> which evidences the willingness of the named insured to permit the first permittee to
> authorize others to drive."

*State Farm Fire & Cas. Co. v. Ricks*, 902 S.W.2d 323, 325 (Mo. Ct. App. 1995) (quoting *U.S.*

*Fidelity & Guaranty Co. v. Safeco Ins. Co. of Am.*, 522 S.W.2d 809, 816 (Mo. 1975)). These

circumstances are not present in this case: Mr. Brandt did not have permission (express or

implied) from Total Lock/Installers to drive the Jeep Liberty; there is no circumstantial evidence

suggesting otherwise; and there is no course of conduct evidencing the willingness of Total

Lock/Installers to permit employees assigned to a particular company vehicle to permit other

employees to drive that vehicle.

Accordingly, this Court finds that Mr. Brandt did not have express or implied permission

to operate the Jeep Liberty on November 26, 2007, and he therefore is not covered under the

omnibus clauses in Total Lock/Installers' liability policies. Because Mr. Brandt did not have

permission to operate the Jeep Liberty, it is not necessary for this Court to examine whether his

use of the vehicle amounted to a major deviation from the permission granted. The Court concludes that Mr. Brandt is not an insured under Plaintiffs' policies for the accident, and will grant Plaintiffs' request and deny Defendants' request for a declaratory judgment regarding the liability coverage of Mr. Brandt.[13]

### B.    COVERAGE FOR DONALD A. BUNCH'S UNDERINSURED MOTORIST CLAIM

Plaintiffs also seek a declaratory judgment finding that they have no duty to provide coverage for Mr. Bunch under the Missouri Underinsured Motorists Coverage, as a result of the accident. Defendants filed counterclaims against Plaintiffs, seeking a declaration that Plaintiff Midwestern Indemnity Company must provide uninsured and underinsured coverage to the Bunches, and requesting that the Court enter judgment against Plaintiff Midwestern Indemnity Company for money damages under the policy's Uninsured Motorist Coverage and Underinsured Motorist Coverage.

The policy issued to Total Lock/Installers by Plaintiff Midwestern Indemnity Company contains a Missouri Uninsured Motorists Coverage endorsement and a Missouri Underinsured Motorists Coverage endorsement, both of which provide coverage for "[a]nyone . . . 'occupying' a covered 'auto.'" Both endorsements also include a coverage exclusion for "[a]nyone using a

---

[13]The Court notes that in the December 22, 2009 Memorandum and Order, it stated that "[i]f the jury finds that Mr. Brandt was an employee, Mr. Brandt would have been authorized to operate company vehicles." (Order, doc. #98, p.24). In the present Order, the Court concludes that Mr. Brandt was an employee of Total Lock/Installers at the time of the accident. However, despite this conclusion, the Court cannot conclude that Mr. Brandt's employee status automatically means that he "would have been authorized to operate company vehicles." To the contrary, the Court's statement in the December 22, 2009 Memorandum and Order was based on facts that have since been discredited and rejected by this Court. Thus, the Court finds that Mr. Brandt's employee status does not affect the conclusion that he did not have express or implied permission to operate the Jeep Liberty on November 26, 2007.

vehicle without a reasonable belief that the person is entitled to do so." (Exhibits to Complaint A-1, A-2). Plaintiffs argue that this permissive use exclusion prevents the Bunches from receiving uninsured or underinsured motorist coverage.

Missouri courts have examined permissive use exclusions on various occasions, and have concluded that such exclusions are not ambiguous and should be afforded their plain meaning. *See Marchand ex rel. Marchand*, 2 S.W.3d 826, 829-30 (Mo. Ct. App. 1999); *Omaha Prop. & Cas. Ins. Co. v. Peterson*, 865 S.W.2d 789, 790 (Mo. Ct. App. 1993). A passenger in a vehicle is considered to be "using" the vehicle for the purpose of the permissive use exclusion. *Marchand*, 2 S.W.3d at 828; *Francis-Newell v. Prudential Ins. Co. of Am.*, 841 S.W.2d 812, 815-16 (Mo. Ct. App. 1992). Thus, because Mr. Bunch was a passenger in the Jeep Liberty at the time of the accident, he was "using" the vehicle, and the permissive use exclusion would apply if Mr. Bunch did not have a reasonable belief that he was entitled to use the Jeep Liberty.

In determining whether a person has a reasonable belief regarding the use of a vehicle, Missouri courts have applied the following factors:

> 1) whether the driver had express permission to use [the] vehicle; 2) whether the driver's use of the vehicle exceeded the permission granted; 3) whether the driver was "legally" entitled to drive under the laws of the applicable state; 4) whether the driver had any ownership or possessory right to the vehicle; 5) whether there was some form of relationship between the driver and the insured, or one authority to act on behalf of the insured, that would have caused the driver to believe that he was entitled to drive the vehicle.

*Marchand*, 2 S.W.3d at 830 (quoting *Omaha Prop. & Cas.*, 865 S.W.2d at 791) (alteration in original). The credible evidence in this case reveals that Mr. Bunch did not have a reasonable belief that he and Mr. Brandt were entitled to use the Jeep Liberty on November 26, 2007. Mr. Brandt had not been given any permission to use the Jeep Liberty, and the Bunches had

permission to use the vehicle on work trips, but they exceeded the permission granted because they had been instructed to leave the vehicle parked until they left for their next out of town trip. Moreover, Mr. Brandt was not legally entitled to drive any vehicle at the time of the accident due to his intoxicated state, of which Mr. Bunch was clearly aware. Finally, this Court has rejected any argument that past events supported a reasonable belief regarding use of company vehicles by anyone not assigned to that vehicle or for any non-business purpose in St. Louis. To the extent that Defendants argue that Mrs. Bunch was the one using the Jeep Liberty (by sending Mr. Brandt on an errand), the same analysis applies.

Thus, the Court concludes that Mr. Bunch was using the Jeep Liberty at the time of the accident and the Bunches did not have a reasonable belief that he was entitled to do so under the circumstances. The permissive use exclusion prevents the Bunches from receiving uninsured or underinsured motorist coverage. The Court will grant Plaintiffs' request and deny Defendants' request for a declaratory judgment regarding uninsured or underinsured motorist coverage for the Bunches, and will deny Defendants' request for judgment in their favor.

## III.  CONCLUSION

The Court has examined the testimony and evidence in this case and has reached various conclusions regarding credibility. These findings lead the Court to conclude that Mr. Brandt is not an insured under Plaintiffs' policies for the accident, and that the Bunches are not covered under the Missouri Uninsured Motorists Coverage endorsement or the Missouri Underinsured Motorists Coverage endorsement. As a result, this Court will enter Plaintiffs' requested declaratory judgment, deny the relief and declaratory judgment requested by Defendants, and enter judgment in favor of Plaintiffs and against Defendants.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' requested declaratory judgment relief is **GRANTED** and Defendants' counterclaims are **DENIED**.

**IT IS FURTHER ORDERED** that judgment is entered in favor of Plaintiffs, and against Defendants.

Dated this <u>15th</u> Day of <u>September</u>, 2010.

E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE